GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A. Shah
Adam T. Berkowitz

*Proposed Counsel for Debtor*
*and Debtor-in-Possession*

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

In re:

FEDERATION EMPLOYMENT AND GUIDANCE      Chapter 11
SERVICE INC. d/b/a FEGS[1],                          Case No. 15-_____ (____)

                    Debtor.

--------------------------------------------------------------x

## AFFIDAVIT OF KRISTIN WOODLOCK PURSUANT TO
## LOCAL BANKRUPTCY RULE 1007-4 AND
## IN SUPPORT OF FIRST DAY MOTIONS

STATE OF NEW YORK        )
                             ) ss.:
COUNTY OF NEW YORK    )

    1.    I am the Chief Executive Officer ("**CEO**") of Federation Employment and

Guidance Service, Inc. d/b/a FEGS ("**FEGS**" or the "**Debtor**"), a voluntary not-for-profit health

and human services organization formed and existing under the laws of the State of New York. I

have been employed as the Debtor's CEO since December 9, 2014 and prior to that, since

September 2013, I served as FEGS' Chief Operating Officer. In my capacity as CEO, I am

familiar with the Debtor's day-to-day operations, business and financial affairs.

---

[1] The last four digits of the Debtor's federal tax identification number are 4000.

2.       I submit this affidavit (this "**Affidavit**") pursuant to Rule 1007 of the Local Bankruptcy Rules for the Eastern District of New York (the "**Local Bankruptcy Rules**") in support of (i) the Debtor's petition for relief filed on the date hereof (the "**Petition Date**") under Chapter 11, Title 11 of the United States Code (the "**Bankruptcy Code**") (the "**Chapter 11 Case**") and (ii) the relief sought by the Debtor in its motions and applications simultaneously filed with the Court (the "**First Day Motions and Applications**").

3.       Unless otherwise stated, the facts set forth in the Affidavit are based upon my personal knowledge as an officer of the Debtor, upon information supplied to me by other members of the Debtor's management and employees of the Debtor, upon my review of relevant documentation and financial information, advice and counsel of the Debtor's professionals, and my opinions based upon my knowledge and information concerning the Debtor's operations and financial affairs.  If called as a witness, I would testify to the facts set forth in this Affidavit. Unless otherwise indicated, all financial information contained herein is presented on an unaudited basis. I am authorized to submit this Affidavit.

## INTRODUCTION

4.       On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor remains in possession of its assets and continues to manage its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee, examiner or committee of creditors has yet been appointed in this case.

5.       In accordance with Rule 1007-2(a) of the Local Bankruptcy Rules for the Eastern District of New York (the "**Local Bankruptcy Rules**"), the first part of this Affidavit sets forth

required information regarding the nature of the Debtor's business and a concise statement of the circumstances leading to the commencement of this Chapter 11 Case.

6.     The second part of the Affidavit details the relief sought by the Debtor in certain "First Day" motions (each, a "**First Day Motion**") and collectively, the "**First Day Motions**"), filed concurrently herewith. The relief sought by each of the First Day Motions is designed to minimize the potential adverse effects that might otherwise flow from the commencement of the Chapter 11 Case on the Debtor's business and to ensure the Debtor's restructuring goals can be implemented with minimal disruption to ongoing operations and client services and the transition of programs as discussed below. The First Day Motions seek relief aimed at, among other things, (a) ensuring continued health and safety of the Debtor's thousands of clients; (b) facilitating the transfer of FEGS programs to other State and City designated providers (c) maintaining employee morale and vendor confidence; (d) ensuring the continuation of the Debtor's cash management systems and related business operations; (e) securing necessary post-petition financing for the funding of the Debtor's post petition operation, and (f) establishing administrative procedures to streamline and facilitate the Debtor's transition into Chapter 11.

7.     I have read, and certify the contents of each First Day Motion and believe that the relief sought therein (i) is critical to ensure client safety and continuity of care; (ii) is necessary to preserve and maximize the value of the Debtor's assets and operations, (iii) is integral to the success of this Chapter 11 Case, (iv) serves the best interests of the Debtor, the Debtor's estate and the Debtor's creditors, and (v) with respect to all non-administrative matters, is necessary to avoid immediate and irreparable harm.

**PART I**

**THE DEBTOR'S HISTORY AND BUSINESS**

3

A. **Overview of the Debtor's History**

8.     Established in 1934 amidst the Great Depression, FEGS is a not-for-profit health and human services organization which provides a broad range of health and social services to more than 120,000 individuals annually in the areas of behavioral health, disabilities, housing, home care, employment/workforce, education, youth and family services. The agency utilizes resources from both the private and public sectors, integrating services from a wide array of professional disciplines throughout the organization, including subsidiary corporations in the areas of information technology, human resources, health care management, residential, and home care services. Its significant infrastructure was designed to allow the Debtor to bring innovation, capacity, resiliency and integrated care platforms across the FEGS organization for the benefit of its funders, donors, partners, and the many clients it serves.

9.     Since its founding, the Debtor has been strongly committed to providing caring, compassionate and high quality health and social services in response to the critical needs of individuals facing complex challenges and in doing so, enabling such individuals to lead more independent and successful lives. During the past eight decades, the Debtor has delivered a comprehensive network of programs and services to the members of its community and improved the lives of millions of New Yorkers with a skilled and committed workforce. Examples of some of the major programs operated by FEGS include the Wellness, Comprehensive Assessment, Rehabilitation and Employment Program (WeCare), Back To Work, education and youth services for at risk youth and Connect to Care. FEGS also administers complex residential and support programs for the developmentally disabled and a comprehensive portfolio of behavioral treatment and residential programs for the mentally ill, in the New York Metropolitan and Long Island region.

3090808v.15

10.     Understanding the diverse and multifaceted needs of the population it serves, the Debtor has consistently placed the needs of its clients at the forefront of its operations and successfully responded to a rapidly growing need for comprehensive and integrated services. Simultaneously, it has been forced to adapt to a rapidly shifting funding and regulatory landscape while tackling emerging health and social issues. At its recent peak, the Debtor's network of programs operated over 350 locations throughout metropolitan New York and Long Island and employed approximately 2217 highly skilled professionals, of which 1405 belonged to the local chapter of the Community and Social Agency Employees Union, District Council 1707 ("**DC 1707**").

11.     Further, as a partner of both state and local governments and agencies, the Debtor has not only remained committed to its mission but also transitioned and accepted other financially challenged not-for-profit organizations into the FEGS network – often at the request of city and state agencies - thereby ultimately ensuring continuity of care and services for thousands of clients in need. Indeed, in countless instances where other similar social service organizations have either been unwilling or unable to deliver essential health and human services to communities in need, the Debtor has taken the initiative to expand the nature and scope of its programs to encompass additional vital services and assume responsibility for their delivery to underserved populations.

12.     The Debtor's operations are overseen and funded, in part, by the New York State Office of Mental Health ("**OMH**") and Office for People With Developmental Disabilities ("**OPWDD**"), and the New York City Human Resources Administration ("**HRA**"), Department of Education ("**DOE**") and Department of Youth and Community Development ("**DYCD**").

13.     OMH is an agency of the New York state government which regulates and certifies the state's mental and behavioral health programs, including those operated by the Debtor, and ensures the quality of care provided by the facility is in compliance with applicable state and regulatory standards.  Through contracts with OMH, FEGS obtains critical revenue necessary for the funding of the Debtor's operations.

14.     OPWDD oversees the coordination of services for the Debtor's developmentally disabled population.  Through programs licensed by OPWDD, which include Medicaid funded long-term care services such as habilitation and clinical services, as well as residential supports and services, the Debtor is able to assist clients and their families in providing care for developmentally challenged individuals.

15.     HRA oversees FEGS' WeCare and Back to Work programs which provide medical assessment, rehabilitation and employment services for the mentally ill population. DOE and DYCD sponsor Learning to Work and youth programs for disadvantaged youth to promote access to the work force.

**B.  Corporate Governance**

16.     The Debtor is a New York not-for-profit corporation that is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.  Its primary purpose is philanthropic in nature and it was initially formed with an aim towards finding employment for tens of thousands of unemployed men and women in the Jewish and broader New York community and to fight workplace discrimination. Its programmatics and client base have vastly expanded over the years.  FEGS is presently governed by a 29 member board of trustees (the "**Board**").  A list of Board Members is annexed as Exhibit A hereto.

3090808v.15

## C. The Non-Debtors

17.    The Debtor also has certain non-debtor affiliates and subsidiaries:

(a)    <u>Staff Resources, Inc. ("SRI")</u>. SRI is a for-profit wholly owned subsidiary of FEGS which is inactive.

(b)    <u>AllSector Technology Group, Inc. ("AllSector")</u>. AllSector is a full-service technology consulting company which provides a diverse range of IT services on an outsourced, project management and subscription fee licensed basis (for ALLTrac System)—including systems integration, network management, desktop support, application/software development and project management—to non-profit, public sector and for-profit clients. FEGS is a 95% owner of, and outsources its IT requirements to, AllSector. Historically, FEGS has accounted for 65% of AllSector's business and revenue stream.

(c)    <u>HR Dynamics, Inc. ("HRD")</u>. HRD was a full-service human resources management consulting, outsourcing and staffing solutions company which provided services to various non-profit and for-profit clients including, until recently, FEGS. HRD's business was substantially wound down by December 31, 2014.

(d)    <u>FEGS Home Attendant Services, Inc. ("HAS")</u>: HAS is a New York State Department of Health ("**DOH**") licensed home health care services agency providing home care services to the elderly and others with chronic long term illness across the five boroughs of New York City.

(e)    <u>FEGS Home Care Services, Inc. ("HCA")</u>: HCA is a DOH licensed home health care services agency that has no active business.

(f)  FEGS ProCare Health Services, Inc. ("ProCare"). ProCare is a non-profit, outpatient Article 28 diagnostic and treatment center licensed by the DOH.  It provides medical assessment for individuals with health and mental health conditions referred to ProCare by HRA in conjunction with the FEGS WeCare Program.  As discussed below, the WeCare Program is being transitioned by HRA to a new provider, Fedcap Rehabilitation Services, Inc. ("**Fedcap**"). It is currently expected that ProCare will continue to provide such assessment services under a Subcontract with Fedcap.

(g)  FEGS Family Care Service, Inc. ("Family Care"). Family Care is a non-profit organization which contracts with HRA to provide homemaker services to families in Queens and Bronx Counties who have children at risk of placement in foster care.  The services were recently terminated.

(h)  Single Point Care Network, LLC ("Single Point").  SinglePoint Care Network is a for-profit limited liability company (50% owned by FEGS) designed to provide specialty care management services and solutions to managed care companies and other payers supporting the healthcare needs of the elderly, those with chronic long term illness and other clients with complex healthcare needs. SinglePoint operated an Independent Practice Association (IPA) comprised of a network of community providers delivering a range of healthcare, housing, employment and other support services to plan members whose services are managed by SinglePoint.  SinglePoint conducts no active business as this time.

## D. **FEGS Related Non-Debtor Housing Entities.**

18.  The Debtor sponsors (and in the case of Tanya Towers is the sole member) of a diverse portfolio of housing and residential environments which support the housing needs of the

homeless mentally ill, those with intellectual and developmental disabilities, low income individuals, seniors and others with disabilities. The following entities comprise the FEGS portfolio of single asset housing entities:

    (a)    *NYSD HDFC, Inc. a/k/a Tanya Towers, Inc.*

    (b)    *NYSD Housing Development Fund Company Inc.*

    (c)    *NYSD Forsyth Inc.*

    (d)    *NYSD Rombouts Housing Development Fund Company Inc.*

    (e)    Waverly Residence, Inc.

## E. Events Leading to the Filing

19.    The Debtor, like many not-for-profit service based organizations, operates in an increasingly challenging environment. No single, but rather a confluence of factors and events have led to FEGS' financial crisis. A continuing decrease in revenue without essential corresponding cost cuts led to substantial operating losses and escalating financial difficulties over the last several years. For example, while revenues fell between fiscal 2013 and 2014, aggregate salaries and benefits increased 7%. General operational and administrative inefficiencies also pervaded the Debtor's programs. An outdated financial management system led to delays and considerable losses in billing and cash collections, causing a further drain on available cash and resources and also compromised management's ability to make responsive business decisions in a timely manner. The Debtor was also overburdened by multiple space obligations which substantially exceeded the Debtor's physical needs and financial capabilities, leading to significant un-reimbursable costs as a result of the unallocated and vacant space. An

overly prohibitive administrative cost structure which was significantly more than target industry standards, coupled with the inability to keep pace with the growing complexities of the organization as a whole, further undermined the Debtor's ability to generate net revenues. The loss of key employees, including three chief financial officers in a two year span, added to the destabilization of the Debtor's operations.

20.     Contributing to the Debtor's dwindling cash flow and mounting operating losses was the Debtor's historical concentration on top line growth without due concern to contract viability within the Debtor's existing administrative framework and business models. The Debtor thus entered into numerous unprofitable agreements, and losses were further exacerbated by a failure to adequately reserve and plan for the repayment of significant regulatory and governmental advances and contract termination costs.

21.     The Debtor also devoted working capital to investments in for-profit affiliates outside its usual service areas in hopes of generating income, including AllSector, HRD and Single Point. Outsourcing its IT and Human Resources functions to these affiliates, the Debtor had hoped these ventures would develop a third party client base that would reduce its administrative costs for these functions and produce profits at the same time. However, the Debtor remained the predominant customer for these affiliates' services, which proved unable to develop sufficient third party client base necessary to function as stand alone entities. As a result, instead of its administrative costs subsequently being reduced, FEGS was forced to fund these affiliates' cash requirements and losses.

**F. Restructuring and Transition Process**

22.     As the Debtor's financial condition continued to deteriorate, the Debtor, and its senior leadership team, became acutely cognizant of the fact that the immediate transfer or

10

closure of its less viable programs and facilities would be necessary and indeed critical to addressing its cash crisis and eliminating its tremendous operating loss.   In 2013, the Debtor's operating losses would have approached $5.5 million but for a one time extraordinary gain of $4.5 million deriving from an insurance settlement and gains at certain of FEGS' consolidated affiliates.  For 2014, the loss reached $19.4 million, inclusive of more than $11 million in operating loss and write off of more than $7.8 million of accrued accounts receivable.  It became quickly apparent in November of 2014 as the fiscal 2014 audit was being completed that the organization's losses were monumental and that cash resources were rapidly depleting.  Clearly, FEGS had hit an urgent financial and cash crisis.

23.    To counteract some of its losses the Debtor began implementing immediate and critical changes within the organization which included significant cost reductions, sizeable layoffs, salary reductions and the restructuring of its senior management team.  Restructuring advisors were also retained to address the Debtor's looming financial crisis.

24.    Under the guidance of its new management and with the assistance of its restructuring consultants, the Debtor thereafter conducted a comprehensive analysis of its existing programs and services to determine their profitability and viability going forward. Following an intensive review process, it was determined that the FEGS WeCare, Back to Work, and developmental and behavioral health programs simply could not be sustained and had to be transferred to other, more financially viable service providers.  To that end, the Debtor actively worked with the relevant governmental and regulatory agencies, including OMH, OPWDD and HRA, in an effort to identify, develop and implement appropriate pathways through which to transition its programs to other providers in a safe and orderly manner, so as to ensure that its

11

existing clients would continue receiving the same high quality and level of services to which they were accustomed.

25.    Given the magnitude of the Debtor's WeCare losses, a transfer of that contract was a priority. HRA immediately contacted Fedcap, the other WeCare vendor in New York City, and discussions ensued regarding the immediate transfer of the program, the limited program assets (purchased with WeCare funds and thus, claimed to be owned by HRA) and certain leases to Fedcap. On January 26, 2015, an assignment agreement was executed providing for the transfer of the WeCare contract and subcontracts for clinical and psychiatric care to Fedcap and Fedcap's assumption of program and leasehold obligations on and after the contemplated effective date of April 1, 2015. The parties are in the process of working through the logistics of equipment conversion and space allocation as well as the hand-off of the program so as to ensure a seamless transition without interruption to the client population.

26.    FEGS' developmentally disabled housing programs posed additional challenges. Besides the significant losses that taxed the agency's financial position, the program's developmentally challenged clients are some of the most vulnerable. Ensuring continuity of care was critical as any lapse in program services could prove catastrophic to this population. A seamless transition of these programs was of paramount importance. Recognizing the time sensitive nature of the problem, OPWDD conducted an emergency request for proposals from other agencies providing services to the developmentally disabled population and received expressions of interest from more than 40 agencies to accept various portions of the programs. OPWDD has selected program transferees, will issue new licenses in connection therewith and all parties are working to transfer associated program assets and real property for fair value while gaining landlord consents to assignment of leased residential facilities. The transfer process of

12

the developmentally disabled programs sponsored by OPWDD is in process as of the filing date. The approval of the transfer will be the subject of a separate motion filed after the commencement of the Chapter 11 case.

27.    A significant portfolio of FEGS' business resided in its behavioral portfolio largely sponsored by OMH.  Prior to the filing of this case, the Debtor was one of the largest behavioral health services providers in the New York City region.  The Debtor's Behavioral Health Division consists of a broad network of services and programs, which are funded or licensed by OMH and work in synergy to serve over 23,000 individuals throughout New York City and Nassau and Suffolk counties.  Services are provided through Article 31 Clinics, psychiatric rehabilitation programs for people with serious mental illness (PROS programs), care coordination services, health homes, case management programs provided in conjunction with local jails, residential and housing services, Assertive Community Treatment (ACT) teams and a various other specialty and self-help programs.   The Behavioral Health Division employs a highly skilled workforce of approximately 900 individuals.

28.    FEGS advocated that the behavioral portfolio, given the integrated nature of the services, be kept intact and transferred to one or two providers.  OMH identified eight agencies that might have the financial and operational ability to integrate such a large amalgam of business and conducted a scoring of their financial strength, operational performance and similarity of business lines to determine the strongest match.  OMH determined that it was in the clients' best interests to transfer all of the associated licenses and program assets to Jewish Board for Family and Child Services ("**JBFCS**").  JBFCS  and FEGS are in the process of negotiating an appropriate agreement for the transfer of all real and personal property and the assignment of associated leases.   The transfer of the program licenses and sale and transfer of associated

13

program assets and properties will be the subject of a separate motion which the Debtor intends to file after the commencement of the Chapter 11 Case.

29.     FEGS' remaining programs, largely centered on employment, youth and education, have been in certain cases prior to the filing, or will be in the context of this case, transferred to other vendors and providers who are best determined to provide the designated services. FEGS is working with HRA, DOE, DYCD and other relevant agencies to effectuate these transfers with client interests being the primary driver. Filed contemporaneously with the Chapter 11 petition is a motion to approve the transfer of the WeCare program and certain of the education and youth related programs that are scheduled to move on April 1, 2015.

30.     As of June 30, 2014 (the end of FEGS' last fiscal year), the Debtor's total unrestricted assets as reported on the balance sheet were just over $144 million and its liabilities totaled approximately $105 million. Its revenues for fiscal year 2014 totaled approximately $264 million while expenses aggregated approximately $285 million. As of the Petition Date, after accounting for the reduction in the workforce deriving from program transfers, the Debtor continued to employ approximately 1902 skilled professionals, of which 1203 belonged to DC 1707. The Debtor's biweekly payroll is approximately $3.6 million inclusive of wage related benefits.

### G.      CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

31.     **Dormitory Authority of the State of New York**. The Dormitory Authority of the State of New York ("**DASNY**"), or its predecessors, the New York State Medical Care Facilities Agency ("**MCCFA**") and the Facilities Development Corporation ("**FDC**") issue various bonds on behalf of the Department of Mental Hygiene ("**DMH**") to finance loans for the construction, rehabilitation and equipping of voluntary agency facilities (a "**Voluntary Agency**"

14

and a "**Voluntary Agency Facility**"). The DMH includes OMH, OPWDD and the Office of

Alcoholism and Substance Abuse Services ("**OASAS**"). The bonds are secured by annual

appropriations from the State of New York. The annual appropriations that secure the bonds are

expected to be mainly derived from mental hygiene patient care income that includes Medicare,

private insurance, third-party beneficiary payments, State appropriation of Federal Medicaid

funds and payments from voluntary agency facilities. The Voluntary Agencies in turn secure

their obligations with various combinations of pledged revenues, mortgages upon real estate, and

security interests in furniture, fixtures and equipment. Bonds are also separately issued to fund

loans to not-for-profit corporations. The not-for-profit corporations in turn secure their loan

obligations with various combinations of pledged revenues, mortgages upon real estate, and

security interests in furniture, fixtures and equipment.   Some programs are also structured with

an intercept of public funds and/or credit enhancements.

(a)    <b>Medical Care Facilities Financing Agency Bonds</b>.

32.    On September 1, 1995, DASNY through State legislation (the "**Consolidation
Act**") succeeded to the powers, duties and functions of the MCFFA and the FDC, each of which

continued its corporate existence in and through DASNY.   Under the Consolidation Act,

DASNY has also acquired by operation of law all assets and property, and has assumed all the

liabilities and obligations, of its predecessors.

33.    On November 2, 1989, MCFFA issued the $67,770,000 Mental Health Services

Facilities Improvement Revenue Bonds, 1989 Series C (collectively, the "1989 MCFFA

Bonds"), and loaned the proceeds thereof to FDC. On or about February 9, 1990, FDC deeded

the property located at 265 East Burnside Ave., Bronx, NY, to FEGS. In connection therewith,

FDC, acting by and through its agent, OMH, made a non-recourse loan to FEGS in the principal

15

amount of $1,905,493 pursuant to a construction loan (the "**1989 FDC Loan**"). In connection with the 1989 FDC Loan, FEGS executed a note, a building loan agreement, and a building loan mortgage and security agreement in favor of FDC. Accordingly, the 1989 FDC Loan is secured by the real property located at 265 East Burnside Ave., all improvements thereon, all furniture fixtures and equipment located therein, and all rents, issues, profits or other income derived from the premises. The 1989 FDC Loan bears interest at the non-default rate of 7.675% and has a maturity date of December 1, 2015. As of February 16, 2015, DASNY contends the aggregate outstanding balance on the 1989 FDC Loan was $373,509.13.

34.    On December 17, 1992, MCFFA issued its $110,810,000 Mental Health Services Facilities Improvement Revenue Bonds, 1992 Series F (collectively, the "**1992 MCFFA Bonds**"). The proceeds of sale the 1992 MCFFA Bonds were loaned to FDC. Thereafter, on or about September 21, 1993 FEGS borrowed $885,500 from FDC, acting by and through its agent, OPWDD,    (the "**1993 FDC Loan**") to refinance certain obligations in connection with the acquisition and improvement of the real property located at 2286 Bronx Park East, Bronx, NY. In connection with the 1993 FDC Loan, FEGS executed a note, a building loan agreement, and a building loan mortgage [and security agreement. Accordingly, the 1993 FDC Loan is secured by the real property located at 2286 Bronx Park East, all improvements thereon, all personal property located therein, and all revenue derived from the premises. The 1993 FDC Loan bears interest at the non-default rate of 6.29% and has a maturity date of August 15, 2018. As of February 16, 2015, DASNY contends the aggregate outstanding balance on the 1993 FDC Loan was $554,029.84.

(b)    **DASNY Mental Health Services Facility Improvement Revenue Bonds**.

16

35.     On March 27, 1996, DASNY, as successor to MCFFA, issued its $61,305,000 Mental Health Services Facilities Improvement Revenue Bonds, 1996 Series C (collectively, the "**1996 DASNY Bonds**"). The purpose of the bond issuance was to finance, in part, the costs of certain projects with respect to certain Voluntary Agency Facilities. On or about March 3, 1998, DASNY, acting through its agent, OMH, made a $3,800,000 loan to FEGS (the "**1996 Series C Loan**"), the proceeds of which were used to satisfy outstanding obligations under a state aid grant which was used in connection with the acquisition and renovation of the property located at 108-112 West 124th Street, New York, NY. The 1996 Series C Loan is evidenced by a note and secured by a mortgage and security agreement encumbering the property located at 108-112 West 124th Street, New York, NY, the personal property located therein, as well as a pledge of all revenue derived from the property. The 1996 Series C Loan bears interest at the non-default rate of 7.5% and has a maturity date of December 1, 2020. As of February 16, 2015, DASNY contends the aggregate outstanding balance on the 1996 Series C Loan was $1,662,537.

36.     On December 18, 1997, DASNY issued its $78,675,000 Mental Health Services Facilities Improvement Revenue Bonds, 1997 Series C (collectively, the "**1997 DASNY Bonds**"). The purpose of the 1997 DASNY Bond issuance was to finance, in part, the costs of certain projects with respect to certain Voluntary Agency Facilities. On or about September 24, 1998, DASNY, acting through its agent, OMH, made a $4,800,000 loan to FEGS (the "**1997 Series C Loan**"), the proceeds of which were used to satisfy outstanding obligations under a state aid grant which was used in connection with renovation of the property located at 3735 White Plains Road, Bronx, NY. The 1997 Series C Loan is evidenced by a note and secured by a mortgage and security agreement encumbering the property located at 3735 White Plains Road, the personal property located therein, as well as a pledge of all revenue derived from the

3090808v.15

property. The 1997 Series C Loan bears interest at the non-default rate of 5.88% and has a maturity date of June 1, 2022. As of February 16, 2015, DASNY contends the aggregate outstanding balance on the 1997 Series C Loan was $2,659,856.37.

37.    On March 21, 2007, DASNY issued its $40,865,000 Mental Health Services Facilities Improvement Revenue Bonds, 2007 Series B (collectively, the "**2007 DASNY Bonds**"). The purpose of the 2007 DASNY Bond issuance was to finance, in part, the costs of certain projects with respect to certain Voluntary Agency Facilities. On or about April 24, 2007, DASNY, acting through its agent, OMH, made a $6,095,200 loan to FEGS (the "**2007 Series B Loan**"), the proceeds of which were used to satisfy outstanding obligations under a state aid grant which was used in connection with renovation of the property located at 162 Kingsbridge Road, Bronx, NY. The 2007 Series B Loan is evidenced by a note and secured by a mortgage and security agreement encumbering the property located at 162 Kingsbridge Road, Bronx, NY, the personal property located therein, as well as a pledge of all revenue derived from the property. The 2007 Series B Loan bears interest at the non-default rate of 4.95% and has a maturity date of December 1, 2031. As of February 16, 2015, DASNY contends the aggregate outstanding balance on the 2007 Series B Loan was $4,708,400.00.

(c)    **New York State Rehabilitation Association, Inc. Pooled Loan Program No. 2 Insured Revenue Bonds**: New York State Rehabilitation Association, Inc. ("NYSRA") is a statewide 501(c)(6) organization representing the interests of its members, which include rehabilitation providers who advocate on behalf of individuals with differing abilities and the agencies that serve them. On August 21, 2003, DASNY issued the New York State Rehabilitation Association Pooled Loan Program No. 2 Insured Revenue Bonds, Series 2003A in the aggregate principal amount of $22,240,000 and Series 2003B in the aggregate

18

principal amount of $795,000 (collectively, the "2003 NYSRA Bonds"). The purpose of the 2003 NYSRA Bonds was to provide money for loans to certain members of NYSRA in order to provide fixed rate financing or refinancing of certain outstanding indebtedness. FEGS entered into a loan agreement dated as of June 25, 2003 with DASNY and NYSRA respecting its allocable share of the 2003 NYSRA Bonds, pursuant to which FEGS borrowed $2,050,000 (the "**2003 NYSRA Loan**") to refinance projects at 3636 Greystone Ave., Apts. 3J and 4E, Bronx, New York; 29 Saddle Rock Road, Valley Stream, New York; and 3277 Perry Avenue, Bronx, New York (collectively, the "**NYSRA Properties**"). The 2003 NYSRA Loan is secured by pledged revenue derived from the NYSRA Properties, bears interest at the non-default rate of 4.2500% and has a maturity date of June 30, 2015. As of January 1, 2015, DASNY contends the aggregate outstanding balance on the 2003 NYSRA Loan was $110,000.

(d)    **InterAgency Council Pooled Loan Program Revenue Bonds**: Formed in 1977 as a not-for-profit membership organization, InterAgency Council of Mental Retardation and Development Disabilities Agencies, Incorporated ("**IAC**") is comprised of voluntary service providers supporting individuals with developmental disabilities in the greater metro-New York area.

38.    On June 30, 2010, DASNY issued the InterAgency Council Pooled Loan Program Revenue Bonds, Series 2010A, consisting of $29,015,000 subseries 2010A-1 and $655,000 subseries 2010A-2 (Federally Taxable) (collectively, the "**2010 IAC Bonds**"). The purpose of the 2010 IAC Bonds was to provide money for loans to certain members of IAC to refinance outstanding indebtedness or reimbursement of cash expenditures incurred by such IAC members, including FEGS. FEGS entered into a loan agreement dated as of March 31, 2010 with DASNY and IAC respecting its allocable share of the 2010 IAC Bonds, pursuant to which FEGS

19

borrowed $820,000 (the "**2010 IAC Loan**") to refinance the acquisition and renovation of 28 Carol Street, West Hempstead, New York. The 2010 IAC Loan is secured by pledged revenue derived from the Carol Street property, a mortgage on the property and security interests in the furniture, fixtures and equipment located at the property. The 2010 IAC Loan bears interest at the non-default rate of 4.1439% and has a maturity date of July 1, 2025. As of January 1, 2015], DASNY contends the aggregate outstanding balance on the 2010 IAC Loan was $620,000.

39.    On March 29, 2012, DASNY issued the InterAgency Council Pooled Loan Program Revenue Bonds, Series 2012A, consisting of $12,285,000 subseries 2012A-1 and $460,000 subseries 2012A-2 (Federal Taxable) (collectively, the "**2012 IAC Bonds**"). The purpose of the 2012 IAC Bonds was to provide money for loans to certain members of IAC to refinance outstanding indebtedness or reimbursement of cash expenditures incurred by five IAC members, including FEGS. FEGS entered into a loan agreement dated as of February 29, 2012 with DASNY and IAC respecting its allocable share of the 2012 IAC Bonds, pursuant to which FEGS borrowed $1,845,000 (the "2012 IAC Loan") to refinance projects at 332 Commack Road, Deer Park, NY; and 130-24 Inwood Street, Jamaica, NY. Of that amount, $570,000 was allocated to the Commack Road property and $1,275,000 was allocated to the Inwood Street property. The 2012 IAC Loan is secured by pledged revenue derived from the Commack Road and Inwood Street properties, mortgages on both properties and security interests in the furniture, fixtures and equipment located at each property. That portion of the 2012 IAC Loan allocable to Inwood Street bears interest at the non-default rate of 3.9209% and has a maturity date of July 1, 2025. That portion of the 2012 IAC Loan allocable to Commack Road bears interest at the non-default rate of 3.9757% and has a maturity date of July 1, 2026. As of January 1, 2015, DASNY contends the aggregate outstanding balance on the 2012 IAC Loans was $1,565,000..

20

40.    **New York City Industrial Development Agency ("NYCIDA")**.  In 2008, the New York City Industrial Development Agency ("**NYCIDA**") issued $17,160,000 aggregate principal amount of Civic Facility Revenue Bonds Series 2008A-1 and $635,000 aggregate principal amount of Civic Facility Revenue Bonds Series 2008A-2 (collectively the "**NYCIDA Bonds**").  A $2,925,000 allocable portion of the proceeds derived from the issuance of the NYCIDA Bonds were utilized to finance or refinance certain of the cost of acquisition, construction and equipping of the Debtor's facilities located at 2782 Johnson Avenue, Bronx, NY, .3827 Steuben Avenue, Bronx, NY, and 424 Swinton Avenue, Bronx, NY (the "**NYCIDA Facilities**").  In connection with the Debtor's receipt of its allocable share of the proceeds of the NYCIDA Bonds, the Debtor entered into, among other things, a Company Lease Agreement, an Installment Sale Agreement and an Agency Mortgage and Security Agreement.  Pursuant to the Company Lease Agreement, the Debtor leases the NYCIDA Facilities to the NYCIDA. Thereafter, NYCIDA sells its leasehold interest in the NYCIDA Facilities back to the Debtor pursuant to an Installment Sale Agreement.  Pursuant to the Agency Mortgage and Security Agreement given in favor of the Bank of New York as indenture trustee for the NYCIDA, the Debtor's obligations under the Installment Sales Agreement, together with all other obligations pursuant to the various transaction documents, are secured by mortgages in the NYCIDA Facilities, all furniture, fixtures and equipment located at the premises, all funds held by the indenture trustee, as well as various other interests of the Debtor and NYCIDA related to the NYCIDA Facilities.  The effective interest rate being paid on the proceeds of the NYCIDA Bonds is 5.829%.  As of November 30, 2014, the outstanding balance on the NYCIDA Installment Sales Contract is $2,925,000, of which $745,000 relates to the Johnson Street

facility, $1,165,000 relates to the Steuben Street facility, and $1,015,000 relates to the Swinton Street facility.

41.     **Suffolk County Industrial Development Agency ("SCIDA")**. In 2008, the Suffolk County Industrial Development Agency ("**SCIDA**") issued $1,610,000 aggregate principal amount of Civic Facility Revenue Bonds Series 2008B-1 and $60,000 aggregate principal amount of Civic Facility Revenue Bonds Series 2008B-2 (collectively the "**SCIDA Bonds**"). The proceeds derived from the issuance of the SCIDA Bonds were utilized to finance or refinance certain of the cost of acquisition, construction and equipping of the Debtor's facilities located at 24 Harrison Avenue, Coram, NY, and 38 Tupper Avenue, Medford, NY (the "**SCIDA Facilities**"). In connection with the Debtor's receipt of the proceeds of the SCIDA Bonds, the Debtor entered into, among other things, a Company Lease Agreement, an Installment Sale Agreement and an Agency Mortgage and Security Agreement. Pursuant to the Company Lease Agreement, the Debtor leases the SCIDA Facilities to the SCIDA. Thereafter, SCIDA sells its leasehold interest in the SCIDA Facilities back to the Debtor pursuant to an Installment Sale Agreement. Pursuant to the Agency Mortgage and Security Agreement given in favor of the Bank of New York as indenture trustee for the SCIDA Bonds, the Debtor's obligations under the Installment Sales Agreement, together with all other obligations pursuant to the various transaction documents, are secured by mortgages in the SCIDA Facilities, all furniture, fixtures and equipment located at the premises, all funds held by the indenture trustee, as well as various other interests of the Debtor and SCIDA related to the SCIDA Facilities. The effective interest rate being paid on the proceeds of the SCIDA Bonds is approximately 5.7%. As of November 30, 2014, the outstanding balance on the SCIDA Installment Sales Contract is

$902,500, of which $315,417 relates to the Harrison Avenue facility and $587,083 relates to the Tupper Avenue facility.

42.    **JPMorgan Chase Line of Credit**    FEGS obtained a $5 million advised line of credit (the "**Line of Credit**") from JP Morgan Chase, of which $3,000,000 has been drawn on account of working capital and $1,042,000 has been drawn in connection with the acquisition, and related renovations, of two parcels of real property, one located on Duryea Street in the Bronx and the other located at 1650 Empire St., Elmont, NY. The aggregate principal balance outstanding as of November 30, 2014 was $4,042,000. The credit line expires on March 27, 2015 and bears interest at a rate of 3.25%. In order to induce JP Morgan Chase to extend the Line of Credit, FEGS executed a Securities Account Control Agreement, dated November 12, 2013, in favor of the bank granting a security interest in all accounts maintained by FEGS at the bank, including FEGS' main operating account and certain investment accounts containing securities.

43.    **Equipment Financings**

(a)    On March 24, 2012, FEGS financed the purchase of a voice over internet protocol telephone system and certain other information technology infrastructure investments, with the proceeds of a $3,000,000 loan from JP Morgan Chase. The loan had a five year repayment term bearing a fixed interest rate of 2.89%. The JP Morgan Chase Loan is secured by the acquired equipment.

(b)    On or about April 25, 2013, FEGS entered into a capital lease arrangement with Bank of America whereby FEGS acquired various information technologies equipment totaling $7,122,943, payable in 60 monthly installments, the first of which is for $252,067.04, the next 58 of which are $126,033.52 each, with the final monthly payment being $0.00. The

outstanding balance as of November 30, 2014 was $4,697,838. At the end of the lease FEGS has an option to purchase the equipment for $1.00. Bank of America was granted a security interest in the financed equipment.

### Other Significant Obligations.

44.     FEGS also received construction advances from both the Department of Housing and Urban Development ("**HUD**") and OMH. HUD advanced approximately $800,000 for construction projects at FEGS' Burnside Avenue and 124th Street locations. As of June 30, 2014, the balances on the HUD advances were $45,000 for the Burnside Avenue Project and $92,000 for the 124th Street project. The HUD advance is neither payable nor secured at this time. OMH advanced approximately $1,038,460 for the design and construction of a residence at Burnside Ave., of which approximately $108,456 remained outstanding as of June 30, 2014. The $1,038,460 OMH advance is secured by a State Aid Grant lien dated September 15, 1998 on 265 East Burnside Avenue, Bronx, New York. OMH also advanced $2,341,638 in connection with the design and construction of a residence located at 15-19 Duryea Place. The $2,341,638 OMH advance is neither payable nor secured at this time.

45.     FEGS also received various advances from various State and City agencies in connection with certain programs it was running. As of January 31, 2015, FEGS has approximately $18.7 million in advances on its books. While some of these advances may be subject to offset and recoupment rights, they are otherwise unsecured.

### LOCAL BANKRUPTCY RULE 1007-2 SCHEDULES

46.     Attached hereto as Exhibit B and incorporated herein by reference are various schedules setting forth information required pursuant to Local Bankruptcy Rule 1007-2.

Capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meaning ascribed to them in preceding paragraphs of this Affidavit.

## PART II

## FIRST DAY MOTIONS AND APPLICATIONS

47.    Simultaneously with the filing of their Chapter 11 petitions, the Debtor filed its First Day Motions and Applications in order to minimize the adverse impact of the commencement of the Debtor's bankruptcy case on its business and its client population.  I believe the approval of the First Day Motions and Applications is critical to the success of this Chapter 11 Case.  I have reviewed the factual background in support of each First Day Motion and Application and certify the facts contained therein are true and correct to the best of my information, knowledge and belief.  A brief overview and summary of the more significant First Day Motions and Applications is set forth herein.[2]

**A.  Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor (A) To Obtain Postpetition Secured  Superpriority Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, AND 364 (II) Granting Adequate Protection to the Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363 AND 364; And (III) Scheduling a Final Hearing Pursuant To Bankruptcy Rules 4001(B) AND 4001(C)[3]**

48.    Access to the DIP Facility and the use of Cash Collateral is critical and vital to the Debtor's ability to fund its postpetition operating requirements in a manner that will permit the continued safe and orderly transition of their numerous client related services to other providers while preserving and maintaining the value of their assets.  Having adequate financing in place also will provide the Debtor's vendors and suppliers with the comfort of knowing that during this transition period, the Debtor will have the financial ability to fund the ongoing purchase of goods and services and otherwise pay their postpetition obligations as they become due.  Of no less

---

[2] In the interest of brevity, summaries of all First Day Motions and Applications have not been included.
[3] Capitalized terms used in this Section II(A) are used with the meanings ascribed to such terms in the Financing Motion.

3090808v.15

import is the fact that absent adequate funding, the Debtor would not have the ability to effectuate the orderly transition of their programs and sale of their assets, both of which are necessary to ensure client safety and preserve value for the benefit of their creditors.

49.    The Debtor contacted six traditional and non-traditional lending sources, of which three expressed preliminary interest. Of these the Debtor was only able to reach agreeable terms with one of those, being the United Jewish Appeal Federation of Jewish Philanthropies of New York, Inc, ("**UJA**"). Given the Debtor's financial condition, existing debt, and other restrictions relating to its not-for-profit status, the Debtor does not believe that a continued search would enable the Debtor to obtain financing on an unsecured basis pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code. Similarly, even if the Debtor was to continue soliciting offers for financing secured by liens on its unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code, or junior liens on its encumbered assets, pursuant to section 364(c)(3) of the Bankruptcy Code, the Debtor believes that such financing would provide for terms that are far more onerous than those of the DIP Facility, including a significantly higher interest rate, liens on the proceeds of Avoidance Actions, more punitive default provisions, adequate protection payments, and countless other fees (i.e., commitment fees, exit fees, monitoring fees, etc.).

50.    Under the proposed DIP Credit Agreement, UJA will make cash advances and other extensions of credit in a maximum principal amount not to exceed $10 million, of which $5 million will be available on an interim basis, as a multiple draw term loan under and subject to the terms and conditions of DIP Documents and Financing Orders.

51.    The proceeds of the DIP Facility under the DIP Documents will be used by the Debtor to: (i) for general working capital purposes and general corporate purposes relating to the postpetition operations; and (ii) the costs and expenses associated with these Chapter 11 Cases,

3090808v.15

including the fees, costs, expenses and disbursements of professionals retained by the Debtor and any statutory committee appointed in these Chapter 11 Cases, and other bankruptcy related costs as allowed by the Court, including amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, all in accordance with the terms of the Debtor's proposed Budget.

52.    All amounts owing by the Debtor under the DIP Facility will be secured by a first priority perfected security interest in and lien on all assets of the Borrower, including all real and personal property (including, without limitation, the two parcels of real property commonly known as 3312-30 Surf Avenue, Brooklyn, NY and 3600 Jerome Avenue, Bronx, NY), but excluding claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 and 553(b) of the Bankruptcy Code, and proceeds thereof, subject only to pre-existing valid liens of record as of the commencement of this Chapter 11 case and certain other agreed carve-outs. In addition, the obligations to UJA under the DIP Facility will constitute allowed super-priority administrative expense claims, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only certain agreed carve-outs.

53.    Also, in the ordinary course of business, the Debtor uses Cash Collateral that is pledged to certain Prepetition Secured Creditors to finance their operations and make essential payments, such as payroll, utility and supplier payments. In conjunction with the DIP Facility, the Debtor requires authorization to continue to use Cash Collateral. Such Cash Collateral usage is required because all borrowings under the DIP Facility will be secured by, among other things, cash receipts that may constitute Cash Collateral of the Prepetition Secured Creditors. Pursuant to the Financing Orders and in accordance with the Budget, the Debtor will use Cash Collateral

in conjunction with the DIP Facility proceeds to fund the Debtor's post-petition operations and to pay other administrative expenses. The Debtor shall provide adequate protection to the Prepetition Secured Creditors by giving replacement liens, making certain scheduled payments and by obtaining consent.

## B. Motion For Order Pursuant to 11 U.S.C. 105(A) And 363 Authorizing Continued Use of Debtor's (I) Bank Accounts (II) Cash Management System; and (III) Business Forms

54.    Prior to the commencement of this case, the Debtor maintained a cash management system (the "**Cash Management System**"), consisting of a series of bank accounts and related investment accounts (the "**Bank Accounts**") through which the Debtor collected deposits and made disbursements in the ordinary course of its operations. The Debtor's bank accounts include, among others, those maintained as disbursement accounts, payroll accounts, investment accounts and receipt accounts as well as various accounts designated for specific client related programs. The Debtor routinely deposits, withdraws, and otherwise transfers funds to, from and between its respective bank accounts by various methods including, checks, automated clearing house transactions, electronic funds transfers and direct deposits.

55.    In connection with the Bank Accounts, the Debtor filed a Motion pursuant to 11 U.S.C. §105(A), 363 and 364 seeking authorization for, inter alia, the continued use of the Debtor's Bank Accounts, Cash Management System, and existing Business Forms (the "**Cash Management Motion**"). As further explained in the Cash Management Motion, the Cash Management System ensures the Debtor's ability to efficiently monitor and control cash receipts and disbursements. Closing the existing bank accounts and opening new accounts at the outset of this case would unnecessarily undermine the Debtor's continued operations and would not only be costly and disruptive, but could threaten the viability of the Debtor's Chapter 11 case. The Debtor thus seeks a waiver of the requirement under the U.S. Trustee Guidelines that the

28

prepetition bank accounts be closed and new postpetition bank accounts be opened. The Debtor further requests that the bank accounts be deemed debtor-in-possession accounts and that their maintenance and continued use be authorized in the same manner and with the same account numbers, styles and business forms as those employed during the prepetition period.

56. Indeed, absent the relief requested herein, ongoing operations may be compromised which would undermine the continued viability of the Debtor's more than 300 programs, putting the Debtor's clients safety and welfare at risk and ultimately costing the estate significant administrative losses which it is ill equipped to sustain at this critical juncture. Accordingly, to ensure a smooth transition into chapter 11 with minimal disruption, and to aid in the Debtor's efforts to complete these proceedings successfully and rapidly the Debtor seeks the relief requested therein.

**C. Motion Pursuant to Sections 105(a), 363(b), 507(a)(4) and (a)(5) and 541(a) of the Bankruptcy Code for an Order (I) Authorizing Payment of Prepetition Wages, Employee Benefits and Expense Reimbursement, (II) Authorizing and Directing Banks to Honor Checks with Respect Thereto (Wage Authorization Motion)**

57. The Debtor's transition efforts require the continued and uninterrupted service of its employees in order to support continuing operations and to maintain consistent, high-quality standards necessary for the proper care and safety of the Debtor's clients as the Debtor works to safely transfer its programs. To avoid the significant risks of resignations and of discontent or loss of morale among essential employees, and in view of the priority awarded to wage claims, it is necessary and appropriate that the Debtor be granted the authorization to pay outstanding prepetition wages, compensation, benefits, vacation and severance pay and expenses.

58. The Debtor has a total of approximately 1902 employees remaining as of the Petition Date, both union and non-union (the "**Employees**"). Historically, the Debtor has paid

employees bi-weekly. The Debtor's bi-weekly payroll each pay period currently aggregates approximately $3.6 million inclusive of payroll related benefits.

59.    The payroll for Employees for the pay period from February 23, 2015 to March 6, 2015 was paid on March 13, 2015. The next payroll, covering the pay period from March 9, 2015 to March 20, 2015 is scheduled to be paid on March 27, 2015. Approximately 12 days of the upcoming pay period constitutes pre-petition wages and payroll related benefits (collectively, the "**Prepetition Wages**").

60.    Thus, the Wage Motion seeks authority to any open pay prepetition wages for the period from March 9, 2015 through Petition Date (approximately $3,085,714.20 in the aggregate, or average of $1,622 per employee, including wage related benefits).

61.    In addition, in the ordinary course of its businesses, the Debtor provides various benefits to its Employees (collectively, the "**Employee Benefits**"). The Employee Benefits include but are not limited to, health insurance, vacation pay, sick pay, holiday pay, workers' compensation, disability, 401(k) and related programs. The estimated aggregate cost to the Debtor of funding the unpaid Employee Benefits to both union and nonunion employees through Petition Date is approximately $4.48 million. The failure to remit Employee Benefits would undermine employee morale and create a hardship. It is thus necessary that the Debtor be permitted to remit payments of any required amounts related to the Employee Benefits that were due as of the Petition Date, and continue providing the Employee Benefits after the Petition Date.

62.    As part of the Wage Authorization Motion, the Debtor also requests authority, in its sole discretion, to continue its existing severance policy and pay prepetition severance obligations owed as of the Petition Date, and to provide any eligible Employees with a severance

30

benefit in the event such Employee is terminated postpetition. The Debtor believes the foregoing relief is necessary to maintain morale and stability among its Employee workforce.

63.    The gross weekly payroll and Employee Benefits for the employees for the above-mentioned periods is less than $12,475 for each employee, excluding executives and various management positions. To the extent the prepetition wages owed any executive or member of management would exceed the priority cap, they will be paid only up to the priority amount.

64.    The Debtor further requests that this Court authorize the Banks to process, honor and pay all prepetition checks issued by, and fund transfer made from, the Debtor with respect to employee wages and Employee Benefits that were not processed, honored or paid as of Petition Date, provided, however, the Banks will not honor checks: (a) for services rendered 180 days prior to the Petition Date, or (b) if payment of same would cause the employee to exceed the maximum $12,425 maximum priority allowance under Bankruptcy Code section 507(a)(4). To minimize the personal hardship the Employees will suffer if the Employee Obligations are not paid, and to maintain the Employees' morale during this time, I believe that it is critical to satisfy the Employee Obligations. Moreover, I believe that such relief on an interim basis will ease the Debtor's transition into chapter 11 and allow for an orderly implementation of the Debtor's goals.

65.    The Debtor is also seeking authority to reimburse Employees for expenses incurred in connection with the performance of their employment obligations. The total amount of reimbursement by the Debtor for employee expenses in the ordinary course of business shall not exceed an aggregate amount of $59,743.65. The Debtor fully anticipates that there will be sufficient cash available to pay all prepetition compensation, deductions, benefits, trust fund taxes and expenses; as such amounts become due in the ordinary course of business.

31

66.     The obligations for which the Debtor seeks authorization to honor were earned by individuals employed by the Debtor, and are services rendered within one hundred and eighty (180) days before commencement of the Debtor's case.    The obligations are for wages and payroll taxes based on such wages, and for the other Employee Benefits mentioned above.

67.     The Debtor submits that the Employees will suffer undue hardship and, in many instances, serious financial difficulties without the relief requested herein.  Without the requested relief, the Debtor's stability would likely be seriously undermined at the outset of this Chapter 11 Cases. Any delay in paying prepetition wages, benefits, severance and deductions or expenses would seriously harm the Debtor's relationship with its Employees and could irreparably impair employee morale at the very time the deduction, confidence and cooperation of the Employees in most critical.  Nor can the Debtor afford to jeopardize client safety by the destabilization of the employee workforce.

## D. Motion for Entry of an Order Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

68.     After becoming aware of the financial crisis facing the Debtor, the Debtor's new management team, with the assistance of its restructuring consultants, conducted a top down analysis of the Debtor's more than 350 programs (of which approximately 74% were losing money). The Debtor was able to identify main areas of concern -- its programs for persons with developmental disabilities, its residential programs, and certain of its workforce, education and youth programs.  Given the Debtor's historical concentration on top line growth without due concern to contract viability within the Debtor's existing administrative framework and business models, and its inadequate financial systems and revenue cycle management which compromised its ability to timely monitor spending and accounts receivable, the Debtor's financial performance on the workforce governmental contracts was among the worst in all its business

32

lines. The Debtor's financial performance under those agreements was further exacerbated by a failure to adequately reserve and plan for the repayment of significant regulatory and governmental advances and contract termination costs. This led the Debtor to conclude that the FEGS' wellness, workforce, and education and youth programs required the most immediate transfers to other, more financially viable service providers.

69.    After potential program assignees were identified, the Debtor entered into a series of tri-party discussions resulting in the execution of various assumption and assignment agreements (the "**Prepetition Assignment Agreements**") with agencies throughout the metropolitan area. The Prepetition Assignment Agreements outline the terms pursuant to which the Debtor will assign, and the respective assignees will assume, the underlying contracts. Certain of the programs were transferred prepetition, but the filing interrupted completion of several programs scheduled to move on April 1, 2015.

70.    Accordingly, the Debtor is seeking to assume and assign the contracts related to those programs pursuant to both Section 365 of the Bankruptcy Code and the Prepetition Assignment Agreements. These agreements constitute both the contractual arrangements pursuant to which the Debtor previously ran certain programs as well as certain leases relating to the real property within which these programs were run. Under the circumstances, such assumptions and assignments unquestionably represent an exercise of the Debtor's sound business judgment and should be approved.

**E. Motion Pursuant to Section 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtor to Continue Workers Compensation Programs, All Other Insurance Policies, Bonds, and Agreements Relating Thereto, and to Pay All Obligations in Respect Thereof**

71.    As a charitable institution, and an umbrella organization of the UJA, the Debtor was in the unique position of procuring its insurance as part of a larger group of UJA affiliated

33

organizations. Accordingly, in the ordinary course of its business the Debtor, together with more than 40 other agencies and not-for-profit corporations (the "**Network Agencies**"), appointed UJA to act on its behalf in negotiating an agreement with FOJP Service Corporation ("**FOJP**"), a New York not-for-profit corporation. As a result of that agreement, FOJP procured insurance coverage for the all of the Network Agencies pursuant to a global service agreement (the "**Service Agreement**"), many of which are global policies with the Debtor listed as one of the insured entities, and which are ultimately administered through several private insurance carriers. The polices provide coverage for, among other things, general liability, property damage, personal injury, professional liability, automobile liability, crime, breach of duty by officers and directors, and various other insurance and risk control programs (collectively, the "**Insurance Policies**"). The premiums for all the Insurance Policies (the "**Insurance Premiums**") are determined annually for all for of the Network Agencies and each is assigned a proportional share of the premiums as well as an administrative fee for FOJP services. The aggregate amount due FOJP from the Debtor is approximately $5.7 million payable in 12 equal monthly installments of $478,732.

72.    It is critical to the Debtor's ongoing operations that it be permitted to continue its Insurance Policies, Insurance Premiums and the Service Agreement continue to be processed and paid. If the Insurance Policies, and by extension the Service Agreement, are not maintained, the Debtor would be required to make alternative arrangements for insurance coverage and almost certainly at a significantly higher cost. Additionally, if the existing insurance programs lapse, the Debtor could be exposed to substantial liability for personal and/or property damages, to the detriment of all parties in interest.

**F. Motion Pursuant to Sections 102(1), 105(a), and 105(d) of the Bankruptcy Code and Rules 1015(c), 2002(m), 9006, 9007, 9014 and 9036 of the Federal Rules of Bankruptcy Procedure for an Order Establishing Case Management Procedures**

73.    In order to streamline the administration of the Debtor's estate and increase overall efficiencies, the Debtor is seeking to establish certain procedures (the "**Case Management Procedures**") which will govern and alleviate certain noticing and related administrative burdens and costs for the Court, the Debtor's estate and all parties in interest. The Debtor anticipate that this case will be large and complex, involving many secured and unsecured claims — some of which may be disputed and potentially litigated. It is expected that many of these potential claimants and parties-in-interest will file requests for notice of filings pursuant to Bankruptcy Rule 2002(i). The Debtor also expects the filing of numerous motions and applications in this case. The proposed Case Management Procedures will permit the orderly and efficient presentation of such claims and filings to the Court.

74.    The Case Management Procedures (a) establish requirements for filing and serving notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents and other papers filed in this Chapter 11 Case, (b) delineate standards for service of notices of hearings and agenda letters; (c) fix periodic omnibus hearing dates and articulate mandatory guidelines for scheduling hearings and objection deadlines; and (d) limit matters that are required to be heard by the Court. Given the magnitude of this Chapter 11 Case, the Debtor believes that the Case Management Procedures will facilitate the efficient administration of this Chapter 11 Cases and permit less burdensome and costly service of Court Papers while still ensuring that appropriate notice is provided. Thus, pursuant to Bankruptcy Rule 2002 and Local Rule 2002-2, the Debtor is seeking approval for the Case Management Procedures and request that the procedures be implemented.

35

75.    Motion Pursuant to 11 U.S.C. §§ 105 and 366 of the Bankruptcy Code Prohibiting

## G. Application Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Garfunkel Wild, P.C. as Counsel for the Debtor

76.    The Debtor has been informed that the members and associates of Garfunkel Wild, P.C. ("GW") who will be engaged in this Chapter 11 Case and who will appear before this Court are admitted to practice before this Court. The Debtor has selected GW as its general bankruptcy counsel because GW and its attorneys have extensive experience and knowledge in the fields of debtors' and creditors' rights, debt restructuring and corporate reorganizations, healthcare, tax law, real estate matters, employee benefits and commercial litigation, among other areas.

77.    GW has represented the Debtor on numerous legal matters in the past, and brings to this case a unique perspective and knowledge base. GW has represented the Debtor as its general counsel for approximately six (6) years prior to the filing of this case. GW is intimately familiar with the Debtor's business and financial affairs, and given the length of its representation, GW is uniquely positioned to represent the Debtor in this case.

78.    In the months leading up to the Chapter 11 filing, GW has been actively involved in this engagement. In addition to the significant work required to prepare the filing, including, inter alia, the preparation of the petitions, schedules, statement of affairs, ancillary documents and first day motions, the negotiation and documentation of loan facilities and drafting of a motion to approve DIP financing, GW has devoted a substantial amount of time over the last several months consulting with the Debtor, OMH, OPWDD, DOE, DOH and other applicable agencies concerning the terms and provisions surrounding the transfer of the Debtor's programs and facilities.

79.    Given the level of GW's involvement to date, the firm is uniquely and well qualified and able to continue to represent the Debtor for the matters in respect of which the firm is to be engaged in this case in a most efficient and timely manner.  If the Debtor is required to retain attorneys other than GW in connection with its Chapter 11 Case, the Debtor and its estate would be prejudiced by the time and expense necessary for such attorneys to become familiar with the Debtor's business operations.  In addition, the Debtor has directed GW to work cooperatively with the other professionals retained in this case to avoid duplication and inefficiency.

80.    GW received a prepetition retainer in the aggregate amount of $200,000 for, among other things, facilitating the transfer of underperforming or deficit programs, developing and restructuring alternative preparation of the bankruptcy filing and for the prosecution of the Chapter 11 Cases.  I am advised that GW will apply against the Retainer any open time in connection with these services incurred prior to the filing and retain the balance.  In addition, within the 90 days prior to the Petition Date, GW was paid an aggregate of $_____ (exclusive of the retainer) and applied these amounts for services expended in connection with services generally provided by GW to FEGS, including an ongoing OMIG audit of FEGS' Medicaid contract payroll.

**H. Application Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Togut, Segal & Segal, LLP as Co-Counsel to the Debtor**

81.    As indicated above, the Debtor is seeking to retain GW as its general bankruptcy counsel to represent the Debtor in connection with the overall prosecution of its Chapter 11 Case. As to those matters which the Debtor may encounter which cannot be appropriately handled by GW as a result of a potential or actual conflict of interest with certain creditors of the Debtor, or other parties in interest, the Debtor is seeking to retain the firm of Togut, Segal & Segal, LLC

37

(the "**Togut Firm**") as co-counsel for the Debtor. It is anticipated that the Togut Firm will perform only such discrete duties as are assigned to the firm and which may include such matters as actions under Chapter 5 of the Bankruptcy Code, objections to certain claims, the assumption and rejection of certain executory contracts and leases and other additional matters as may be assigned to the Togut Firm by GW in consultation with the Debtor.

82.    The Togut Firm has extensive experience and expertise in supplementing the work of main counsel in chapter 11 cases and has previously worked with GW as co-counsel in several matters. Thus, the professionals of the Togut Firm are well positioned to work with the professionals of the GW firm and provide service in an efficient and non-duplicative manner. The members of the Togut Firm, as well as counsel to and the associates of the Togut Firm, who will be employed in this Chapter 11 Case, are members in good standing of the Bar of the State of New York and the United States District Court for the Southern and Eastern Districts of New York.

83.    The Debtor has selected the Togut Firm as co-counsel because the firm's practice is highly specialized and is limited, almost exclusively, to matters pending in the Bankruptcy Courts. The Togut Firm's experience in representing debtors as co-counsel is of particular relevance and will inure to the benefit of the Debtor and its estate.

84.    The Togut Firm received a prepetition retainer in the amount of $25,000 in connection with this filing. I am advised that the Togut Firm will apply against the retainer any open time in connection with services rendered prior to the filing and retain the balance.

**I.  Application Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention Retain J&L Consulting as Financial Consultant**

85.    In November of 2014, J&L Consulting ("**J&L**") was retained by the Debtor to provide financial consulting and restructuring advice to the Debtor, including matters relating to

potential strategic mergers or partnership transactions.  Specifically, J&L was engaged to: (a) lead an effort to develop options to improve strategic position and financial performance and position; (b) provide assistance in facilitating the transfer and/or closure of underperforming and financially challenged programs; (c) provide advice with respect the financial viability of various restructuring alternatives; (d) generally assist with creditor negotiations and negotiations with other healthcare systems with respect to partnership; and (e); consulting on other critical financial issues as and when necessary.

86.    J&L has, in fact, assisted the Debtor and its management in developing and implementing strategic and tactical options designed to improve liquidity, facilitate the transition into Chapter 11 and achieve its restructuring goals.  J&L also led the Debtor's effort to negotiate with key governmental and regulatory agencies with respect to the transfer of those programs which were no longer viable or otherwise feasible for the Debtor to continue operating.

87.    J&L, in conjunction with the Debtor's proposed restructuring counsel, assisted the Debtor in negotiating and securing near term operating liquidity including negotiating with the DOH and DASNY on access to restructuring pool loans and the timing and use of grant funding.

88.    J&L has extensive experience and expertise in restructuring matters in relation to healthcare entities.  J&L has acted as a consultant in several hospital and healthcare restructuring cases and is well versed in its field.  Given J&L's level of involvement to date, and the valuable services J&L has provided, it is necessary and in the best interests of the estate that J&L be retained in this case to continue providing the services.

89.    J&L received $_____ as a retainer and has applied open time in connection with preparing for and conducting the filing of these Chapter 11 cases against it.  J&L will hold

the unapplied residual retainer until the end of the Chapter 11 Case.  In the 90 days prior to the Petition Date, J&L received retainers and payments totaling $_____ in the aggregate for services performed for the Debtor.  J&L has applied these funds to amounts due for services rendered and expenses incurred prior to the Petition Date.

90.    Given JLC's unique familiarity with the Debtor's operations and expertise in providing restructuring and financial advisory services to healthcare entities, the Debtor believes JLC's retention is necessary and beneficial to the estate and its creditors.

**J.  Application Pursuant to Sections 327 and 328 Authorizing the Employment and Retention of Crowe Horwath as Forensic Auditors for the Debtor**

91.    The Debtor is seeking to retain Crowe Horwath as forensic auditors for the Debtor, to: (i) provide certain auditing, consulting, support and/or expert testimony services to the Debtor, including among other things, with respect to ongoing operational and accounting matters and (ii) prepare all necessary reports and findings required in conjunction therewith (collectively, the "**Services**").

92.    Crowe also acted as the Debtor's forensic auditor during the months preceding this filing, and thus has significant institutional knowledge of the Debtor and its financial affairs. It is thus in the best position to complete the required services for the Debtor on an expedited, cost-effective basis.    Given Crowe's institutional knowledge of the Debtor, and its familiarity with the Debtor's overall operations, the Debtor, in consultation with its professionals, determined that it is in the best interest of the Debtor and all of its creditor constituencies to continue to retain Crowe as its forensic auditors in this Chapter 11 Case.

93.    Crowe received a prepetition retainer of $30,000 on December __, 2014 (the "**Initial Retainer**") and another $40,000 on February __, 2015 (the "**Supplemental Retainer**",

40

and, together with the Initial Retainer, the "**Retainer**"). Prior to the Petition Date, Crowe applied the Retainer to the payment of current fees. As of the Petition, Crowe estimates that after application to then existing work in process the balance of the Retainer is approximately $_____.

94.    As further detailed in the Application to retain Crowe, the Debtor believes the employment and retention of Crowe on the terms and conditions set forth herein is necessary and essential and in the best interest of the Debtor, its estate, and their creditors.

**K. Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) Appointing Rust Consulting/Omni Bankruptcy,as Claims and Noticing Agent for the Debtor**

95.    The Debtor is seeking the appointment of Rust Consulting/Omni Bankruptcy ("**Rust Omni**") to act as the official claims and noticing agent for these Chapter 11 Case, and assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtor's Chapter 11 cases. The Debtor anticipates that there will be in excess of 2000 entities to be noticed in this case. In view of the number of anticipated claimants and complexity of this case, the Debtor submits that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtor, its estate and all creditors.

96.    By appointing Rust Omni as the Claims and Noticing Agent in this Chapter 11 case, the distribution of notices and the processing of claims will be expedited, and the Clerk's office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

97.    Rust Omni has acted as the claims and noticing agent in numerous cases of comparable size in this and other districts. Rust Omni has significant expertise in these matters and is well qualified to act as the claims and noticing agent in these cases. Prior to the Petition

41

Date the Debtor provided Claims and Noticing Agent a retainer in the amount of $15,000. No other payments have been made by the Debtor to Rust Omni in the year preceding the filing of this Chapter 11 case.

## CONCLUSION

98.     As discussed above, the Debtor determined to seek relief under Chapter 11 in order to preserve and maximize value for the benefit of all creditors and parties in interest. To that end, the breathing spell afforded by Chapter 11 will permit Debtor, with the assistance of its professionals, to consummate a proposed sale transaction that will ensure the highest realization of value for the Debtor's assets and properties while addressing its obligations to creditors under a Chapter 11 plan and the auspices of this Court.

_Kristin Woodlock_, Chief Executive Officer

Sworn to me this 18th day
of March, 2015

_____
Notary Public

WINNIE AU
Notary Public, State of New York
No. 01AU6099691
Qualified in Queens County
Commission Expires October 6, 2015

3090808v.15