GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A. Shah
Adam T. Berkowitz

*Proposed Counsel for Debtor*
*And Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:

FEDERATION EMPLOYMENT AND GUIDANCE          Chapter 11
SERVICE, INC. d/b/a FEGS,[1]                          Case No. 15-71074 (REG)

                    Debtor.
-------------------------------------------------------------x


**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER (A)**
**AUTHORIZING THE TRANSFER OF OPWDD CLIENT PROGRAMS,**
**(B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF**
**CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN**
**CONNECTION WITH SUCH TRANSFERS, AND (C) RELATED RELIEF**

Federation Employment and Guidance Service, Inc. d/b/a F.E.G.S. ("**FEGS**" or the

"**Debtor**"), as debtor and debtor-in-possession in this Chapter 11 case (the "**Chapter 11 Case**"),

by and through its proposed attorneys, Garfunkel Wild, P.C., respectfully submits this motion for

the entry of an order (the "**Transfer Order**"), substantially in the form of Exhibit A hereto, (i)

authorizing the Debtor to enter into assignment/termination agreements (each a "**Transfer**

**Agreement**"), as applicable, substantially in the form annexed hereto as Exhibit B pursuant to

which the Debtor will transfer its portfolio of programs for people with developmental

disabilities (the "**DD Programs**") to a small group of qualified agencies (the "**DD Acquiring**

---

[1] The last four digits of the Debtor's federal tax identification number are 4000.

**Agencies**")[2], (ii) authorizing the Debtor to enter into triple net leases substantially in the form annexed hereto as Exhibit D, reimbursement agreements substantially in the form annexed hereto as Exhibit E, and other related agreements associated with the transfer of the DD Programs, including, without limitation such agreements as are necessary to ensure that client privacy rights are not violated; (iii) approving the assumption and assignment of those executory contracts and unexpired leases (the "**Assigned Agreements**") related to the DD Programs as set forth on Exhibit C[3], and (iv) granting related relief (the "**Motion**").  In support of the Motion, the Debtor relies upon the Affidavit of Kristin Woodlock In Support of DD Program Transfers (the "**Woodlock Affidavit**"), and respectfully states the following:

## SUMMARY OF RELIEF SOUGHT

1.     This case was commenced with the single minded goal of ensuring that within a fiscally and operationally responsible framework FEGS would be able provide its more than 4,000 developmentally disabled clients, who are among the most at risk members of our society, with the assurance that the services they have come to rely upon and so desperately need on a day-to-day basis will continue.  Given the financial position the Debtor found itself in late last year, the only way to accomplish that is to transfer the Debtor's DD Programs to the DD Acquiring Agencies.  While this Chapter 11 proceeding is still only a few weeks old, the dedicated staff and management of the Debtor have been working tirelessly for months to ensure

---

[2] A schedule setting for the respective DD Acquiring Agencies taking each of the DD Programs, together with any space related to such programs is annexed hereto as Exhibit C.

[3] The inclusion of a contract or lease in Exhibit C to this Motion shall not constitute an admission by the Debtor that any such contract is an executory contract, that the Debtor has any liability under any contract or lease, or, in the case of an equipment lease, whether the underlying transaction is a true lease or a financing, and the Debtor reserves all rights, claims, and defenses in connection therewith.  Moreover, the Debtor reserves the right to withdraw or add any contract or lease from or to Exhibit C to this Motion at any time prior to entry of a final order of the Court on the relief requested herein.

that the safety and welfare of its client population was never compromised. One of the results of such effort was the transfer of the balance of the New York City agency sponsored programs on April 1st, which was approved by this Court on March 31, 2015 [Docket No. 107]. There the Court found that the proposed transfer date was not arbitrary but instead "critical to ensuring the safety and welfare of the Debtor's clients in each of the programs being transferred." The Court further found that "the Debtor cannot ensure the continued provision of program services and protection of the clients in these programs beyond such scheduled transfer date." Id.

2.    In much the same way, the Debtor now finds itself in the untenable position of not being able to ensure the continued provision of services within its remaining DD Program portfolio beyond May 1, 2015. To be clear at the outset, there is nothing arbitrary or capricious about this date. The Debtor would have transferred the DD Programs sooner if it were able, but with the intervening Chapter 11 filing, this is the earliest date the Debtor can hope to transfer the programs with the approval of this Court. Despite taking all possible steps to create an environment in which the continuation of services can be provided, including obtaining ten million dollars in debtor-in possession financing and making numerous requests for emergency relief to ensure continuity of payments for vendors and staff, external factors beyond the Debtor's control continuously threaten to derail the process. Chief among those is the Debtor's concern that it will be unable to continue to safely staff the DD Programs, many of which are residential assistance programs requiring 24 hour client supervision and assistance. Numerous employees who provided indispensible direct support, clinical, therapeutic and program oversight services to both the Debtor and its clients have already tendered their resignations. Based on the Debtor's existing knowledge of planned staff departures in the coming weeks, coupled with the expectation of additional departures under the circumstances, the Debtor fully expects that the situation will worsen as more time passes. Moreover, the Debtor has seen an

increased use of sick days, putting a severe strain on its ability to utilize the limited temporary staffing capacity it has to fill the gaps. Further exacerbating an already tenuous situation, the Debtor does not have the ability to merely replace these employees as there are strict regulatory and credentialing guidelines designed to prevent client abuse which, to date, the relevant State agencies have been unwilling and/or unable to modify. Given these concerns, at best, any delay in transferring the DD Programs is not in the clients best interests; at worst, any delay puts the safety and well-being of the Debtor's clients at substantial risk.

3.      Based on the foregoing, the Debtor has no choice but to seek the relief requested herein on an emergency basis. Understanding the potential issues with the respect to the transfer and or sale of its real and personal property assets, the Debtor has devised a two step process which would allow for the programs to transfer now and reserve for a later date the sale or transfer of its real and personal property. The programs would therefore transfer without prejudice to the Debtor's creditors and other parties in interest rights respecting the Debtor's real and personal property assets. This two step process is in the best interest of the Debtor's clients as well as its creditor constituencies.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6006-1

4

of the Local Rules of the Bankruptcy Court for the Eastern District of New York (the "**Local Rules**").

## PROCEDURAL BACKGROUND

6.      On March 18, 2015 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is authorized to operate its business and/or continue to manage its property as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

7.      On March 31, 2015 the United States Trustee appointed a creditors' committee in this case (the "**Committee**").  As of the date hereof, the Committee has not yet chosen its counsel.

8.      The Debtor, like many not-for-profit service based organizations, operates in an increasingly challenging environment.  No single, but rather a confluence of factors and events have led to FEGS' financial crisis.  A detailed description of the Debtor's business and the reasons for the filing of this Chapter 11 Case is set forth in the Affidavit of Kristin Woodlock Pursuant to Local Bankruptcy Rule 1007 and in Support of First Day Motions, filed on the Petition Date and incorporated herein by reference.

## FACTS RELEVANT TO THE MOTION

9.      As previously outlined for this Court, after becoming aware of the financial crisis facing the Debtor, the Debtor's new management team, with the assistance of its restructuring consultants, conducted a top down analysis of the Debtor's more than 350 programs (of which approximately 74% were losing money).  The Debtor was able to identify main areas of concern -- its programs for persons with developmental disabilities, its residential programs, and certain

of its workforce, education and youth programs. The Debtor focused first on addressing those programs causing the most severe and immediate cash drain on the Debtor's operations. Those programs, administered mostly by the City of New York, were the first to be transferred. Despite the Debtor's best efforts some of those programs needed to be transferred after the commencement of this Chapter 11 case and the Debtor sought, and ultimately obtained, Court approval for those transfers.

10.    At the same time the Debtor was transferring the City programs to new providers, the Debtor was working with various other governmental and regulatory agencies, including, among others, the New York State Office of Mental Health ("**OMH**") and Office For People With Developmental Disabilities ("**OPWDD**") which govern the BH Programs (as hereinafter defined) and the DD Programs, respectively.

11.    A significant portfolio of FEGS' business resides in its behavioral portfolio largely sponsored by OMH. Prior to the filing of this case, the Debtor was one of the largest behavioral health services providers in the New York metropolitan area.    The Debtor's Behavioral Health Division consists of a broad network of services and programs, which are funded or licensed by OMH and work in synergy to serve over 23,000 individuals throughout New York City and Nassau and Suffolk counties (the "**BH Programs**").    Services are provided through Article 31 Clinics, psychiatric rehabilitation programs for people with serious mental illness (PROS programs), care coordination services, health homes, case management programs provided in conjunction with local jails, residential and housing services, Assertive Community Treatment (ACT) teams and a various other specialty and self-help programs.    The Behavioral Health Division employs a highly skilled workforce of approximately 900 individuals.

6

12.    FEGS advocated that the BH Programs, given the integrated nature of the services, be kept intact and transferred to one or two providers.  OMH identified eight agencies that might have the financial and operational ability to integrate such a large amalgam of business and conducted a scoring of their financial strength, operational performance and similarity of business lines to determine the strongest match.  OMH determined that it was in the clients' best interests to transfer all of the associated licenses and program assets to the Jewish Board of Family and Children Services ("**JBFCS**").  Prior to the Petition Date, JBFCS and FEGS began the process of negotiating an appropriate agreement for the transfer of all real and personal property and the assignment of associated leases.  Due to a number of factors, including the sheer number of leases related to the BH Programs, issues related to FEGS owned real property, the logistical issues of such a sizeable portfolio transfer and the Debtor's severe liquidity crisis, a deal could not be reached prior to the filing.  With the basic framework of the transfers ironed out pre-petition, the Debtor and JBFCS committed to undertake the transfers in an expeditious manner in this Chapter 11 proceeding.  In fact, consummation of that transaction is not only contemplated in, but is a condition to, the debtor-in-possession financing the Debtor obtained in connection with this case.  After an in depth review of the Debtor's staffing needs, current liquidity position, and JBFCS's readiness to assume operations, the Debtor determined that it would be able to continue operating the BH Programs through May, 2015.  Accordingly, such transfers will be subject of a separate motion.

13.    FEGS' developmentally disabled housing and support programs, administered under the auspices of OPWDD, posed additional and more time pressing challenges.  Besides the significant losses that taxed the agency's financial position, the program's 4,000 developmentally challenged clients are some of the most vulnerable.  FEGS' DD residences are home to more 300 individuals, ages 18-80, who have mild, moderate, severe or profound mental

7

retardation. Some are also on the autism spectrum and many have complex behavioral and medical issues. Many residents are challenged by significant medical and behavioral issues, including histories of elopement and chronic conditions such as heart disease, diabetes, obesity, seizure disorders and high blood pressure. Functionally, some individuals are able to dress, feed and go to the bathroom by themselves; others cannot speak, walk or lift their head; while others are fed through a feeding tube. Ensuring continuity of care remains critical as any lapse in program services could prove catastrophic to this population. A seamless transition of these programs remains of paramount importance.

14.    Recognizing the time sensitive nature of the problem, OPWDD conducted an emergency request for proposals from more than 75 agencies providing services to the developmentally disabled population and received expressions of interest from more than 40 agencies to accept various portions of the programs. From among that pool of applicants, OPWDD selected the DD Acquiring Agencies and committed to assigning existing agreements or issuing new licenses to those designated providers. Prior to the Petition Date, all parties were working to transfer associated program assets and real property for fair value while gaining landlord consents to assignment of leased residential facilities. The prospect of transferring hundreds of leases and negotiating fair market value asset sales of the Debtor's real and personal property proved to be a far greater task than was achievable without the protections and processes afforded the Debtor under the Bankruptcy Code. Accordingly, while the transfer of the DD Programs sponsored by OPWDD was in process as of the filing date it could not be consummated until now.

8

## THE BIFURCATED PROCESS

15.    As noted above, OPWDD, the DD Acquiring Agencies and the Debtor all expended tremendous resources in an attempt to transfer the DD Programs prior to the commencement of this Chapter 11 Case.  Nonetheless, the exigencies of the Debtor's businesses, including the services it provides and the nature of the Debtor's client population, when coupled with the enormity of the logistical and staffing issues in moving an entire portfolio of programs created severe obstacles to consummating the transactions prepetition.  When it became clear that the transfers would not occur prior to the commencement of this case, the parties began working with all deliberate speed towards a post-petition transfer/sale process.  As originally contemplated by the parties, that transaction was to proceed by a private sale process pursuant to section 363 of the Bankruptcy Code with the terms included in a series of fully negotiated asset purchase agreements whereby fair value would be received by the Debtor and its estate for the real and personal property assets transferred to the Acquiring Agencies.  As part of that process it was contemplated that the Debtor would voluntarily assign its program agreements to the DD Acquiring Agencies or, at the State's election, relinquish its licenses (such agreements or licenses, as the case may be, the "**Program Agreements**"), which would be re-issued to the Acquiring Agencies.

16.    The Debtor's senior management, however, has grave concerns regarding the Debtor's ability to maintain critical staffing levels at the DD Programs long enough to complete even an expedited transfer process.  The Debtor already faces serious challenges in maintaining adequate staffing to serve its highly vulnerable population.  FEGS currently has more than 100 staff vacancies in this service area.  Since February there have been 38 staff resignations in the DD Programs alone with turnover rates doubling to 33% and rising, especially at those DD

9

3184791v.6

Programs where the Debtor has no commitment from the relevant DD Acquiring Agency that it will hire the Debtor's existing staff. In addition, staff aware of their upcoming retrenchments began using more sick time.

17.    To compensate for these staffing issues, the Debtor has utilized more than 13,000 hours of staff overtime at an expense of more than $230,000. FEGS, as well, has been increasingly reliant on temporary staff. The Debtors currently have more than 100 temporary staff working in the DD Programs taxing the staffing agencies' ability to even provide qualified people, who need to undergo a similar credentialing process to permanent staff members. At this point, 79 unfilled requests are pending with temporary agencies. Moreover, even if a new group of additional temporary staffing became available, given the nature of the services provided and the relationships that even the Debtor's current temporary staff has with the clients, it remains a suboptimal solution as any new staff members would be unfamiliar with the clients, their families and their respective day-to-day needs. In addition, the Debtor's managers, who are exempt employees, have been working tirelessly, putting in numerous overtime hours without additional compensation. This is simply not a sustainable situation.

18.    While the Debtor would gladly hire additional staff, under the circumstances it is not a practical solution. As noted above, it takes time for new staff to get to know the clients, their families and their individual needs. Moreover, the Debtor's critical staff include: (i) direct support professionals who assist residents with, among other things, eating, bathing and using the toilet while, at the same time, are expected to provide companionship, socialization and recreation opportunities; (ii) specially trained staff who are certified to administer medications; (iii) clinical staff including psychologists, psychiatrists, nurses, physical therapists, occupational therapists, nutritionists and others; and (iv) management staff who provide critical oversight to

the programs and residences serving this highly vulnerable population. The Debtor's liquidating posture makes it highly unlikely, if not impossible, for the Debtor to attract qualified candidates to fill open positions. Moreover, the Debtor lacks the HR capacity to implement a recruitment and onboarding process at this critical juncture, which requires extensive health checks, background checks and approval processes required for anyone working in this field, including criminal record checks and other Justice Center mandated requirements. Under the best of circumstances, the typical onboarding time frame for a new employee is 25 days.

19.     In addition to the Debtor's staffing concerns, the timing of the transfers themselves have been a cause of great consternation for not only the Debtor and its staff, but most importantly for the Debtor's clients who have been on a roller coaster since the transition was first announced in January 2015. Based on guidance from OPWDD, clients, their families and staff were initially told that the transition would occur on February 28th, a date which was then pushed to April 1. Most recently, there was an expectation that the transition would occur on May 1st. The continued uncertainty has caused significant stress to the clients being served by the Debtor as well as their families, not to mention the toll it has also taken on the Debtor's workforce. It is widely recognized that, due to the nature of their disabilities, individuals with developmental disabilities often have significant difficulty managing uncertainty and adapting to change and new relationships. Clinically, these kinds of situations can result in anxiety, serious acting out behaviors including self-injurious behaviors and aggression towards others, additional medication needs and hospitalizations. These are issues that the Debtor has tried to minimize in the normal course of service delivery but which have, to a certain extent, become unavoidable in connection with the transition and exacerbated as transfers get progressively delayed. It is therefore a serious concern for the safety and welfare of the client population that the services be transferred as soon as possible.

11

20.    Accordingly, in order to expedite the transfer process and ensure continued client safety and care, the Debtor, in consultation with OPWDD and the DD Acquiring Agencies, determined to bifurcate the issues related to the sale of its real and personal property from the transfer of the programs (the "**Bifurcated Process**").

21.    The first stage of the Bifurcated Process is designed to transfer the DD Programs on an expedited basis while ensuring that upon transfer the DD Acquiring Agencies have the immediate use of all real and personal property necessary to run their respective programs.  In order to accomplish that, first the Debtor anticipates entering into Transfer Agreements with each of the DD Acquiring Agencies pursuant to which the Debtor will either surrender its existing license to OPWDD or transfer its existing program agreements to the respective DD Acquiring Agencies.  As part of the Transfer Agreements the Debtor will also license to the respective DD Acquiring Agencies the right to use all of the personal property related to each of the DD Programs, whether owned or leased, with a concomitant obligation for the DD Acquiring Agencies to cover, through indemnification or direct payments, all costs associated therewith. The general terms of the Transfer Agreements include the following[4]:

(1)    The assumption and assignment or, at the State's request, the termination and consent to reissuance of the Program Agreements.

(2)    The Debtor shall be entitled to all accounts receivables related to services rendered prior to the effective date and shall remain liable for all pre-effective date liabilities, including any cure amounts related to the Assigned Agreements.  The respective DD Acquiring

---

[4] The descriptions, terms and conditions set forth herein respecting the Transfer Agreements, the Triple Net Leases and the Reimbursement Agreements are provided for the convenience of the Court and the parties-in-interest.  In the event of any inconsistency between the description of the terms of the Transfer Agreements, the Triple Net Leases and the Reimbursement Agreements or any other documents contained in this Motion and the actual executed documents, the terms contained in the executed documents shall govern.  Defined terms used in connection with these descriptions but not otherwise defined in the Motion shall have the meanings ascribed to such terms in the Transfer Agreements, the Triple Net Leases and the Reimbursement Agreements, as applicable.

Agencies are entitled to all accounts receivables related to services rendered after the effective date and shall be liable for all liabilities incurred from and after the effective date.

(3)     The acknowledgement and understanding that title to all of the Debtor's real and personal property assets will remain with the Debtor until such time as it may be subsequently sold and or transferred, which shall be the subject of a separate agreement request for relief from the Court.

(4)     All personal property of the Debtor utilized in connection with any of the DD Programs shall be licensed for a period of up to one year to the respective DD Acquiring Agencies, with the DD Acquiring Agencies assuming all responsibility and liability associated therewith from and after the effective date.

(5)     The Debtor and the DD Acquiring Agencies commit to taking all steps necessary in connection the assumption and assignment of real property leases and entry into appropriate agreements respecting the Debtor's owned real property.

22.     While there are certain DD Programs which are "spaceless," the remaining programs operate out of real property that is either owned by the Debtor, leased by the Debtor or leased by a client of the Debtor.  The Debtor intends to assume and assign its interests in real property leases pursuant to this motion and make such other arrangements as are necessary with respect to expired leases or shared space.  There is no action necessary with respect to client leases and, with respect to the owned real property, the Debtor intends to enter in to triple net leases or reimbursement agreements[5], as applicable, with the respective DD Acquiring Agencies for a period of up to a year.  The general terms of the Triple Net Leases include the following:

(1)     The Debtor intends the Base Rent component of the lease to be sufficient for the Debtor to continue servicing any Debt associated with the respective properties.[6]

(2)     The Debtor's provision of the leased premises to the DD Acquiring Agencies on an "as is" basis, without representation or warranty of any kind.

---

[5] The reimbursement agreements are intended to be used with respect to owned cooperative apartments, or other situations where a lease or sublease is either impractical or impermissible, as a bridge until the underlying property can be sold.

[6] To the extent it becomes impractical for the debt service to be included as a component of base rent because of the any DD Acquiring Agencies reimbursement scheme or otherwise, the Debtor and the respective DD Acquiring Agencies will work together to ensure that sufficient funds are remitted either to the Debtor or directly to the holder of any such debt obligation to satisfy all debt service as and when due.

3184791v.6

(3)    The direct payment by the DD Acquiring Agencies of all taxes, assessments, and related charges respecting the leased properties.

(4)    The maintenance by the DD Acquiring Agencies of all necessary insurance and utilities and all expenses related thereto.

(5)    The DD Acquiring Agencies are required to maintain the leased real property at their sole costs and expense, keep all aspects of the premises in good working condition, make all necessary repairs in connection with the premises.

(6)    The DD Acquiring Agencies are prohibited from permitting any lien or charge against the premises, making any alterations to the premises.

(7)    Certain termination rights in favor of the Debtor if, among other things, the DD Acquiring Agencies fail to satisfy their obligations under the lease.

23.    Where the Debtor can neither assume and assign a lease nor grant sublease to the DD Acquiring Agencies, the Debtor shall enter into a Reimbursement Agreements, the general terms of which include the following:

(1)    The DD Acquiring Agencies shall pay either to the Debtor, or at the Debtor's direction directly to the landlord, all amounts as and when they become due under any lease related to the properties subject to the Reimbursement Agreement.

(2)    The DD Acquiring Agencies shall assume all other liabilities related to any and all premises identified under the reimbursement agreement, form and after the determined transfer date.

24.    Stage 2 of the Bifurcated Process, which should commence as soon as practicable after the initial transfers are complete, is when the Debtor and the Acquiring Agencies will enter into and, subject to Bankruptcy Court approval, consummate the sale of the Debtor's real and personal property assets that are essential to continued program operation.

25.    By consummating the contemplated transactions via this bifurcated approach the Debtor accomplishes several important short and long term goals. In the first instance the Debtor ensures the health and safety of the more than 4,000 clients it serves within the DD Program portfolio by avoiding potentially catastrophic staffing issues and a disruption or, worse, termination of client services. The Debtor also immediately stems the cash flow losses

14

associated with the DD Programs, freeing up resources to deal with financial as opposed to program issues. Finally, the Debtor positions its remaining assets associated with the DD Programs for a sale to the DD Acquiring Agencies, which, in many instances is not only the best scenario for the Debtor's clients, but also for realizing the most value for the assets.

## PROGRAMS BEING TRANSFERRED

26.      The Debtor's portfolio of DD Programs is comprised of numerous programs which, as noted above, are being transferred to the respective DD Acquiring Agencies as set forth on Exhibit C annexed hereto. Also delineated on Exhibit C is the description of the real property being utilized by each of the current DD Programs. The DD programs fall into the following general categories:

(a)      **Individual Supports and Services (ISS) Programs** - FEGS' Individual Supports and Services assist adults with developmental disabilities who wish to live as independently as possible by providing support services and rent subsidies for apartments in NYC and Long Island.

(b)      **Individualized Residential Alternatives (IRA) Programs** - FEGS' Individualized Residential Alternatives are a type of community residence that provides room, board and individualized service options for individuals with intellectual and developmental disabilities. There are two types of IRAS, Supervised and Supportive.

(i)      **Supportive IRAs**- FEGS' Supported IRAs offer individuals with intellectual and development disabilities who require less than 24-hour staff supervision a variety of staff supports in NYC and Long Island. These supports are based on the person's individual service plan ("**ISP**") and typically include assistance with medication administration, food shopping, money management and other independent living skills.

(ii)      **Supervised IRAs**- FEGS' Supervised IRAs provide individuals with intellectual and developmental disabilities with 24-hour staff oversight and

15

supervision in NYC and Long Island. Each Supervised IRA may offer support to up to 14 individuals. An emphasis is placed on developing independent living skills and community inclusion, with clinical supports available to individuals based on ISPs.

(c)    **Day Hab**- FEGS' Day Habilitation Services assist individuals with intellectual and developmental disabilities to acquire, retain or improve their self-help, socialization, and adaptive skills including communication, travel and other areas in adult education. Activities and environments are designed to foster the development of skills and appropriate behavior, greater independence, community inclusion, relationship building, self-advocacy and informed choice.

(d)    **Medicaid Service Coordination**- Medicaid Service Coordination (MSC) is a Medicaid State Plan service provided by OPWDD which assists persons with developmental disabilities gain access to necessary services and supports appropriate to his/her needs. MSC is provided by qualified service coordinators who use a person-centered planning process to develop, implement, and maintain the person's ISP, which promotes the concepts of choice, individualized services and supports, and consumer satisfaction.

(e)    **Prevocational Services**- FEGS' Prevocational Services assist individuals with intellectual and developmental disabilities to acquire, retain, or improve the skills necessary to obtain and maintain employment. Services are intended to develop and teach general skills that lead to employment including but not limited to: communicating effectively with supervisors, co-workers and customers; understanding appropriate workplace conduct and dress; following directions; problem solving; and travel training.

16

## BASIS FOR RELIEF REQUESTED

A.    **Entering into the Transfer Agreements and Consummating the Transactions Contemplated Thereby, Including Entry Into Leases of its Owned Real Property, is a Valid Exercise of the Debtor's Sound Business Judgment**

27.    Section 363(b) of the Bankruptcy Code governs the use, sale or lease of assets outside the ordinary course of business.  Section 363(b)(1) provides, in relevant part, that a debtor in possession may, after notice and hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate." See 11 U.S.C. § 363 (b)(1) and (f).

28.    Under applicable case law, a transaction must represent a reasonable exercise of business judgment on the part of the debtor in possession to be approved under section 363(b) of the Bankruptcy Code. See, e.g., In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 772 F.2d 1063, 1071 (2d Cir. 1983); In re Adelphia Communications Corp., No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002).  See also In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993), quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy).

29.    As recognized by the Second Circuit in Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d. Cir. 1983), a court may approve a section 363 application after expressly determining from the evidence presented at the hearing that a good business reason exists to grant such application.

17

30.     In addition, Bankruptcy Code section 105(a) grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a). This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case." In re Flores, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003).

31.     The Debtor submits that there are compelling facts and circumstances to support approval of the transfers as described in this Motion, including the entry into leases of its real property.  As discussed above, the decision to proceed with the Bifurcated Process in order to transfer the DD Programs was one of necessity and resulted from a sincere concern for the safety and well being of the Debtor's clients.  Absent the transfer of the DD Programs to the DD Acquiring Agencies on an expedited basis, the Debtor would continue suffering unnecessary financial losses and would be unable to assure this Court, OPWDD or its clients that it will be able to sustain sufficient staffing levels necessary to safely provide services.  A necessary component of any such program transfer is entry into a lease of the Debtor's owned property for a sufficient period of time to permit the programs to continue operating after the transfer date. Accordingly, the Debtor requests authority to enter into the Transfer Agreements with OPWDD and the DD Acquiring Agencies, enter into leases for its owned real property and execute such other agreements as may be necessary to effectuate such transfers, including such agreements as may be necessary to ensure that client privacy rights are not violated.

**B.    Assumption of the Assigned Contracts and Assignment Procedures Should be Approved**

32.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor".

33.    The business judgment test is the standard applied by courts to determine whether an executory contract or unexpired lease should be assumed.  See, e.g., In re Old Carco LL (f/k/a Chrysler LLC), 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); Richmond Leasing Co v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially").  A court should approve assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate.  See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr.S.D.N.Y. 1989); see also Sharon Steel Corp v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

34.    When assuming an executory contract or unexpired lease, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults.  If there has been a default, the debtor must also provide adequate assurance of future performance under the contract or lease.  As part of the transfer process the Debtor has committed to curing any defaults under the proposed Assigned Agreements.  The Debtor's anticipated cure amounts are set forth on Exhibit C and the Debtor requests that to the extent there are objections to the proposed cure amounts, and given the Debtor's commitment to paying all cures, that the Court approve the assumption and assignment while holding open the issue of the exact cure amount to a subsequent hearing date.  If such relief is granted, the Debtor will work with the objecting party to resolve the cure objection prior

19

to any subsequent hearing.  Moreover, the DD Acquiring Agencies all have the support and funding of OPWDD, which should suffice as adequate assurance of future performance.

35.    Assuming and assigning the Assigned Agreements to the respective DD Acquiring Agencies is an appropriate exercise of the Debtor's business judgment.  The Assigned Agreements consist mostly of residential leases which have been the home for many of FEGS' clients for years, if not decades.  As would be expected, this transition period has been trying on FEGS' clients and, even if it were possible, to make those client's leave their homes would be unthinkable.  Moreover, these are short term market, or near market, rate leases.  Accordingly there can be little to no value realized in connection with any sale or marketing of those leases. Therefore, assumption of the Assigned Agreements and assignment to the respective DD Acquiring Agencies is clearly an exercise of the Debtor's sound business judgment which warrants approval by this Court.

36.    The Debtor further submits that the notice provided by this Motion and the schedules contained in the Exhibits hereto are reasonably calculated to provide adequate notice to all counterparties to the Assigned Agreements.  Accordingly, the Debtor requests that pursuant to Rule 6006 of the Bankruptcy Rules the Court authorize the use of a single motion to approve the assumption and assignment of the Assigned Agreements.

## C.    Section 363(d) of the Bankruptcy Code is Satisfied

37.    Pursuant to Section 363(d) of the Bankruptcy Code, the use, sale or lease of property by a not-for-profit entity must be in compliance with applicable nonbankruptcy law. Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law

that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation...." 11 U.S.C. § 363 (d).

38.     The Debtor submits that the transfers contemplated by this Motion fully comply with applicable non-bankruptcy law as OPWDD has consented to the transfer of each of the DD Programs and selected each of the DD Acquiring Agencies.  The Debtor further submits that no further approvals are required at this time.  When the Debtor is prepared to sell its real and personal property assets, the Debtor will request, and expect to obtain, all required regulatory approvals for any such sale, including the approval of the New York State Attorney General. Accordingly, the proposed transfer of the DD Programs to the DD Acquiring Agencies as contemplated by this Motion satisfies the requirements of section 363(d) of the Bankruptcy Code.

## II.     THE COURT SHOULD WAIVE OR REDUCE THE REQUIREMENTS OF RULES 6004

39.     The Debtor's need for immediate authority to enter into the Transfer Agreements, execute triple net leases, and assume and assign the Assigned Agreements is necessary to ensure client health and safety as well as to stem the mounting losses the Debtor is suffering. Accordingly, the Debtor proposes that the 14 day stay period of an order authorizing the use, sale or lease of the Debtor's property as well as the assumption and assignment of executory contracts and unexpired leases imposed by Bankruptcy Rule 6004 should be waived.  That rule provides that, unless a court orders otherwise, an order authorizing the assumption and assignment of executory contracts is stayed until the expiration of 14 days after entry of the order.  Fed. R. Bankr. P. 6004.  The purpose of Bankruptcy Rule 6004 is to provide sufficient time for an objecting party to appeal before the order takes effect.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

40.     As described above, the transfer of the DD Programs to the DD Acquiring Agencies is consensual, a sound exercise of the Debtor's business judgment and any delay in authorizing such transfers could severely impact the health and safety of the Debtor's clients as well as have a negative impact on the Debtor's proposed cash flows. Accordingly, the likelihood of a party in interest objecting to the relief sought herein is negligible, the benefits to the estate and all stakeholders are numerous and the Court should waive the 14 day stay period provided for in Bankruptcy Rule 6004(h), and order that the Debtor is immediately authorized to assume and assign the Assigned Agreements pursuant to Section 365 of the Bankruptcy Code and the Prepetition Assignment Agreements, all as described in this motion.

## III.    NO PRIOR REQUEST

41.     No previous request for the relief sought herein has been made to this or any other court.

## IV.    CONCLUSION

42.     The case law cited herein provides ample authority and justification for the approval of the proposed transactions. The facts set forth herein also support a finding in favor of an order approving the such transfers. For these reasons, and the others set forth in this Motion, it is submitted that the transfers should be approved on the terms and provisions set forth in the Transfer Agreements.

**WHEREFORE** the Debtor respectfully requests that the Court enter an order substantially similar to the proposed order, attached hereto as Exhibit A, granting the relief requested herein, and granting the Debtor such other and further relief as is just and proper.

Dated:    April 3, 2015
        Great Neck, New York

                             GARFUNKEL WILD, P.C.

                             By: _____
                               Burton S. Weston
                               Afsheen A. Shah
                               Adam T. Berkowitz
                               111 Great Neck Road
                               Great Neck, NY  11021
                               Telephone: (516) 393-2200
                               Facsimile: (516) 466-5964

                             *Proposed Counsel for the Debtor*
                             *and Debtor in Possession*

3184791v.6