GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Facsimile: (516) 466-5964
Burton S. Weston
Afsheen A. Shah
Adam T. Berkowitz

*Proposed Counsel for Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:

| | |
|---|---|
| FEDERATION EMPLOYMENT AND GUIDANCE SERVICE, INC. d/b/a FEGS,[1] | Chapter 11 <br> Case No. 15-71074 (REG) |

Debtor.

-------------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (A)**
**AUTHORIZING THE TERMINATION OR SURRENDER OF OMH CLIENT**
**PROGRAM AGREEMENTS AND OPERATING CERTIFICATES;**
**(B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION**
**WITH SUCH TRANSFERS; (C) AUTHORIZING THE LEASE OF**
**CERTAIN OWNED PROPERTY; AND (D) RELATED RELIEF**

> **THE MOTION REQUESTS AUTHORITY TO ASSUME AND ASSIGN EXECUTORY**
> **CONTRACTS AND LEASES.  PARTIES RECEIVING THIS MOTION ARE ADVISED**
> **TO FIND THEIR NAME, CONTRACT OR LEASE ON EXHIBIT C ANNEXED**
> **HERETO TO DETERMINE THE DEBTOR'S INTENDED DISPOSITION THEREOF**

Federation Employment and Guidance Service, Inc. d/b/a FEGS ("**FEGS**" or the

"**Debtor**"), as debtor and debtor-in-possession in this Chapter 11 case (the "**Chapter 11 Case**"),

by and through its proposed attorneys, Garfunkel Wild, P.C., respectfully submits this motion for

the entry of an order (the "**Transfer Order**"), substantially in the form annexed hereto as Exhibit

---

[1] The last four digits of the Debtor's federal tax identification number are 4000.

A̲ hereto, (i) authorizing the Debtor to enter into a termination and transfer agreement (the "**Omnibus Termination Agreement**"), substantially in the form annexed hereto as Exhibit B, pursuant to which the Debtor will surrender operating certificates or terminate program agreements comprising its portfolio of behavioral health programs (the "**BH Programs**") and consent to the reissuance of such agreements to the Jewish Board for Family and Children Services (the "**JBFCS**"), (ii) authorizing the Debtor to enter into triple net leases (the "**Triple Net Leases**") and, with respect to 3600 Jerome Ave., a gross lease (the "**Gross Lease**") for JBFCS' use of debtor owned properties associated with BH Programs, substantially in the forms annexed hereto as Exhibits D and E[2] respectively, and other related agreements relating to the transfer, including, without limitation such agreements as are necessary to ensure that client privacy rights are not violated; (iii) approving the assumption and assignment of those executory contracts and unexpired leases (the "**Assigned Agreements**") related to the BH Programs as set forth on Exhibit C[3], and (iv) granting related relief (the "**Motion**"). In support of the Motion, the Debtor relies upon the *Affidavit of Kristin Woodlock In Support of BH Program Transfers* (the "**Woodlock Affidavit**") filed concurrently herewith, and respectfully states the following:

---

[2] Executed copies of the Omnibus Termination Agreement, the Triple Net Leases, and the Gross Lease will be filed with the Court prior to the hearing on the Motion.

[3] Parties receiving this motion are advised to locate their names, contracts and or leases on Exhibit C to determine the Debtor's intended disposition thereof. The inclusion of a contract or lease in Exhibit C to this Motion shall not constitute an admission by the Debtor that any such contract is an executory contract, that the Debtor has any liability under any contract or lease, or, in the case of an equipment lease, whether the underlying transaction is a true lease or a financing, and the Debtor reserves all rights, claims, and defenses in connection therewith. Moreover, the Debtor reserves the right to withdraw or add any contract or lease from or to Exhibit C to this Motion, or otherwise change the Debtor's intended disposition thereof, at any time prior to entry of a final order of the Court on the relief requested herein. A final schedule of Assigned Agreements will be filed with the Court prior to the hearing on the Motion.

2

## SUMMARY OF RELIEF SOUGHT

1.      On April 3, 2015, the Debtor filed an emergency motion (the "**DD Motion**") to transfer its portfolio of programs servicing and supporting people with developmental disabilities (the "**DD Programs**"). Citing staffing concerns, among other things, the Debtor requested that those programs be transferred on May 1, 2015. For a number of reasons, including those stated on the record at the April 16, 2015 omnibus hearing, a May 1st transfer was not possible. While those staffing concerns have not entirely dissipated, the Debtor has thus far been able to maintain the critical staff necessary to ensure client safety at all of its programs. In addition, the Debtor has taken several steps designed to maintain safe staffing levels through the new projected transition date and continues to implement additional safety nets as and when practical and needed. The DD Motion is now scheduled to be heard on May 19, 2015 and, subject to court approval, the Debtor contemplates transferring the DD Programs on or about June 1, 2015.

2.      As outlined in the DD Motion, the Debtor also had concerns regarding its ability to maintain adequate staffing for its portfolio of behavioral health programs. However, at the time that motion was filed, the Debtor had conducted an in depth review of its staffing needs, its then current liquidity position, and JBFCS's readiness to assume operations. The Debtor concluded that it would be able to continue operating the BH Programs through June 1, 2015 and continued working with JBFCS, its counsel and consultants so that all parties would be ready for a June 1st transition. Accordingly, the Debtor is requesting that the Court approve the same bifurcated two step process outlined in the DD Motion. If approved, the bifurcated process will permit the transfer of the BH Programs, along with the assumption and assignment of the Debtor's related real property leases, on June 1st to JBFCS while, as set forth more fully below, preserving all parties liens, claims and interests in the Debtor's real and personal property assets.

Accordingly, the best interests of the Debtor's clients will be served by quickly transferring the BH Programs to JBFCS, an agency with the financial wherewithal to ensure continuity of care, while the creditors will be able to fully explore the business and financial issues surrounding the disposition of the Debtor's assets in a more normalized timeframe.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief sought herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6006-1 of the Local Rules of the Bankruptcy Court for the Eastern District of New York (the "**Local Rules**").

## PROCEDURAL BACKGROUND

5.      On March 18, 2015 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is authorized to operate its business and/or continue to manage its property as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.      On March 31, 2015 the United States Trustee appointed a creditors' committee in this case (the "**Committee**").

4

7.    The Debtor, like many not-for-profit service based organizations, operates in an increasingly challenging environment. No single, but rather a confluence of factors and events have led to FEGS' financial crisis. A detailed description of the Debtor's business and the reasons for the filing of this Chapter 11 Case is set forth in the *Affidavit of Kristin Woodlock Pursuant to Local Bankruptcy Rule 1007 and in Support of First Day Motions*, filed on the Petition Date and incorporated herein by reference.

## FACTS RELEVANT TO THE MOTION

### I.    City and DD Programs

8.    As previously outlined for this Court, after becoming aware of the financial crisis facing the Debtor, the Debtor's new management team, with the assistance of its restructuring consultants, conducted a top down analysis of the Debtor's more than 350 programs (of which approximately 74% were losing money). The Debtor was able to identify main areas of concern -- its programs for persons with developmental disabilities, its residential programs, and certain of its workforce, education and youth programs. The Debtor focused first on addressing those programs causing the most severe and immediate cash drain on the Debtor's operations. Those programs, administered mostly by the City of New York, were the first to be transferred. Despite the Debtor's best efforts some of those programs needed to be transferred after the commencement of this Chapter 11 case and the Debtor sought, and ultimately obtained, Court approval for those transfers.

9.    At the same time the Debtor was transferring the City programs to new providers, the Debtor was working with various other governmental and regulatory agencies, including the New York State Office of Mental Health ("**OMH**") and Office For People With Developmental

Disabilities ("**OPWDD**") which govern the BH Programs and the DD Programs, respectively. Both OPWDD and OMH ran a request for proposal process to identify potential providers to assume the program obligations. The OPWDD process is outlined more fully in the DD Motion and the OMH process is set forth below.

10.    Given the enormity of the external factors threatening to undermine the DD Programs, the DD Motion was filed on April 3, 2015 as an emergency motion in the hopes of transferring those programs on May 1st. As discussed above, the May 1st date proved to be unattainable for a number of reasons, and the DD Motion is scheduled to be heard at the May 19, 2015 hearing. In anticipation of that hearing, the Debtor is working with all of the DD acquiring agencies to finalize and execute all required termination agreements, leases and reimbursement agreements for filing prior to the hearing date.

**II.    BH Programs**

11.    In addition to the City and DD Programs, FEGS operates numerous programs and services for individuals with mental illness and behavioral health diagnoses which are certified and/or funded by OMH, the New York City Department of Health and Mental Hygiene and local mental health services agencies in Nassau and Suffolk (collectively, the "**Regulatory Agencies**"). Prior to the filing of this case, the Debtor was one of the largest behavioral health services providers in the New York metropolitan area. The Debtor's portfolio of BH Programs consists of a broad network of services and programs, which work in synergy to serve over 30,000 individuals throughout New York City and Nassau and Suffolk counties. Services are provided through Article 31 Clinics, psychiatric rehabilitation programs for people with serious mental illness (PROS programs), health homes and care coordination services, long term care

6

services, residential and housing services, recovery based rehabilitation and clinical services and a variety of specialty and self-help programs. The Behavioral Health Division employs a highly skilled workforce of approximately 900 individuals.

12.    FEGS advocated that the BH Programs, given the integrated nature of the services, be kept intact and transferred to one or two providers. OMH identified eight agencies that might have the financial and operational ability to integrate such a large amalgam of business and conducted a scoring of their financial strength, operational performance and similarity of business lines to determine the strongest match. OMH determined that it was in the clients' best interests to transfer all of the associated licenses and program assets to JBFCS[4]. Prior to the Petition Date, JBFCS and FEGS began the process of negotiating an appropriate agreement for the transfer of all real and personal property and the assignment of associated leases. Due to a number of factors, including the sheer number of leases related to the BH Programs, issues related to FEGS owned real property, the logistical issues of such a sizeable portfolio transfer and the Debtor's severe liquidity crisis, a deal could not be reached prior to the filing. With the basic framework of the transfers ironed out pre-petition, the Debtor and JBFCS committed to undertake the transfers of the BH Programs in an expeditious manner in this Chapter 11 proceeding.

## THE BIFURCATED PROCESS

13.    As previously noted, OMH, JBFCS and the Debtor all expended tremendous resources in an attempt to negotiate the transfer of the BH Programs prior to the commencement

---

[4] The sole exception are certain health homes on Long Island for which the Debtor intends to surrender its operating certificates. Current clients will be shifted to other existing health home providers on Long Island.

of this Chapter 11 Case. As originally contemplated by the parties, that transaction was to proceed by a private sale process pursuant to which the real and personal property assets would be sold/transferred under section 363 of the Bankruptcy Code. As part of that process it was contemplated that the Debtor would voluntarily assign its program agreements to JBFCS or, at the State's election, relinquish its licenses (such agreements or licenses, as the case may be, the "**Program Agreements**"), which would be re-issued to JBFCS. In addition, the Debtor's program related real property leases would be assigned to JBFCS.

14.     As the Court has repeatedly recognized, there are two distinct constituents in this Chapter 11 proceeding, the clients and the creditors, each of which has different needs and interests. Client safety and the assurance of continuity of care, however, are of paramount import. The business interests of the creditors, while important, do not need to be addressed with the same urgency. Thus, in accordance with the Debtor's not for profit mission, and in order to expedite the transfer process so as to ensure continued client safety and care, the Debtor, in consultation with OMH and JBFCS, determined to bifurcate the issues related to the sale of its real and personal property from the transfer of the programs (the "**Bifurcated Process**").

## I.     Stage 1 of the Bifurcated Process

15.     The first stage of the Bifurcated Process is designed to transfer the BH Programs on an expedited basis while ensuring that upon transfer JBFCS has the immediate use of all real and personal property necessary to run the BH programs. In order to accomplish that, the Debtor and JBFCS will enter into the Omnibus Termination Agreement pursuant to which the Debtor will surrender its existing licenses to the Regulatory Agencies, and the Regulatory Agencies will reissue them to JBFCS. As part of the Omnibus Termination Agreement, the Debtor will also

8

license the right to use designated personal property related to the BH Programs, whether owned

or leased, with a concomitant obligation for JBFCS to cover, through a reimbursement

component, all costs associated therewith. The general terms of the Omnibus Termination

Agreement include the following[5]:

    (1)    The termination and consent to reissuance of the Program Agreements.

    (2)    The Debtor shall be entitled to all accounts receivables related to services rendered prior to the effective date and shall remain liable for all pre-effective date liabilities, including any cure amounts related to the Assigned Agreements. JBFCS is entitled to all accounts receivables related to services rendered after the effective date and shall be liable for all liabilities incurred from and after the effective date.

    (3)    The acknowledgement and understanding that title to all of the Debtor's real and personal property assets will remain with the Debtor until such time as it may be subsequently sold and or transferred, which shall be the subject of a separate agreement and request for relief from the Court.

    (4)    Certain personal property of the Debtor utilized in connection with the BH Programs, to the extent scheduled by JBFCS, shall be licensed for a period of up to one year to JBFCS, with JBFCS assuming all responsibility and liability associated therewith from and after the effective date.

    (5)    The Debtor and JBFCS commit to taking all steps necessary in connection the assumption and assignment of real property leases and entry into appropriate agreements respecting the Debtor's owned real property.

16.    While there are certain BH Programs which are "spaceless," the remaining

programs operate out of real property that is either owned by the Debtor, leased by the Debtor or

leased by a client of the Debtor. The Debtor intends to assume and assign its interests in real

---

[5] The descriptions, terms and conditions set forth herein respecting the Omnibus Termination Agreement, the Triple Net Leases, and the Gross Lease are provided for the convenience of the Court and the parties-in-interest. In the event of any inconsistency between the description of the terms of the Omnibus Termination Agreement, the Triple Net Leases, the Gross Lease or any other documents contained in this Motion and the actual executed documents, the terms contained in the executed documents shall govern. Defined terms used in connection with these descriptions but not otherwise defined in the Motion shall have the meanings ascribed to such terms in the Omnibus Termination Agreement, the Triple Net Leases, or the Gross Lease as applicable. As noted earlier, the Debtor intends to file executed copies of the Omnibus Termination Agreement, each of the Triple Net Leases, and the Gross Lease in advance of the May 19, 2015 hearing.

property leases pursuant to this motion and make such other arrangements as are necessary with respect to expired leases or shared space. There is no action necessary with respect to client leases and the Triple Net Leases and the Gross Lease are designed to provide JBFCS with the necessary access to the Debtor's owned real property while stage 2 of the bifurcated process develops. The general terms of the Triple Net Leases include the following:

(1)    The Base Rent shall be de minis, however, the Debtor's Debt service obligations will continue to be paid by OMH to DASNY on behalf of the Debtor.

(2)    The Debtor's provision of the leased premises on an "as is" basis, without representation or warranty of any kind.

(3)    The direct payment by JBFCS of all taxes, water and sewer charges, assessments, and related charges respecting the leased properties, if any.

(4)    The maintenance by JBFCS of all necessary insurance and utilities and all expenses related thereto.

(5)    JBFCS is required to maintain the leased real property at its sole cost and expense, keep all aspects of the premises in good working condition, make all necessary repairs in connection with the premises.

(6)    Certain termination rights exist in favor of the Debtor if, among other things, JBFCS fails to satisfy their obligations under the lease.

17.    The real property located at 3600 Jerome Ave. currently houses multiple programs, certain of which are going to JBFCS while others are going to one of the DD acquiring agencies. Accordingly, the Debtor cannot enter into a triple net lease for the property and instead intends to enter into the Gross Lease with respect to the space JBFCS intends to take. The general terms of the Gross Lease include the following:

(1)    The Base Rent shall be established based on market rents for similar space in the same geographic area.

(2)    The Base Rent is intended to be sufficient to cover the costs associated with, among other things, maintaining necessary utilities and services to the premises.

(3)    The Debtor's provision of the leased premises on an "as is" basis provided, however, the Debtor remains responsible for the general maintenance of the building as there will be more than one tenant in the space.

(4)    Certain termination rights exist in favor of the Debtor if, among other things, JBFCS fails to satisfy their obligations under the lease.  Certain early termination rights also exist in favor of JBFCS.

## II.    Stage 2 of the Bifurcated Process

18.    Stage 2 of the Bifurcated Process, which should commence as soon as practicable after the June 1st transfers are complete, contemplate the Debtor and JBFCS entering into a definitive agreement for the sale and/or transfer, subject to Bankruptcy Court approval, of the Debtor's real and personal property assets that are essential to continued program operation.

19.    By consummating the contemplated transactions via this bifurcated approach the Debtor accomplishes several important short and long term goals.  In the first instance, the Debtor ensures the health and safety of the more than 30,000 clients it serves within the BH Program portfolio by transferring those programs to a financially stable operator with the full faith and support of OMH.  Continuity of care and client safety will be ensured and a significant number of jobs will be preserved.  In addition, the Debtor positions its remaining assets associated with the BH Programs for a sale to JBFCS, which, in many instances is not only the best scenario for the Debtor's clients, but also for realizing any value for the assets.

## PROGRAMS BEING TRANSFERRED

20.    The Debtor's portfolio of BH Programs is comprised of numerous programs which, as noted above, are being transferred to JBFCS.  Delineated on Exhibit C are each of the BH Programs together with a brief description thereof, the address at which the Program operates and a description of the Debtor's interest in such real property, along with additional

11

information to identify each program and the related Program Agreements.  As a general matter, the BH Programs fall into the following categories:

   (a)    **Outpatient Mental Health Clinics** are licensed by OMH and staffed by social workers, nurses and psychiatrists. Through assessment, diagnostics, verbal therapy and medication management, the Debtor's clinics serve children and adults with a wide range of emotional problems.

   (b)    **School Based Clinics** are licensed by OMH and staffed by social workers, nurses and psychiatrists and provide thorough assessment, diagnostics, verbal therapy and medication management for high school students.

   (c)    **PROS** is a model of rehabilitation and recovery, licensed by the New York State Office of Mental Health serving individuals who are at least 18 years of age and have a history of serious mental illness, often accompanied by co-occurring substance use and medical problems. Based on Individual Recovery Plans developed by the staff and client, PROS participants develop the skills they need to live successfully in the community.  Separate programs also provide peer led support and advocacy to MICA ( Mentally Ill Chemical Abusers) clients in the PROS program and in the community.

   (d)    **Health Homes** are targeted for people with chronic medical and mental health conditions.  Health Homes rely on Care Coordinators to develop integrated care plans and to coordinate services such as health care, psychiatric treatment, housing, vocational training, employment, and other services.  Certain programs have Lead Health Home designation which means they provide coordination of Health Home providers and outreach to new enrollees.

(e) **Community Residences** focus on individual needs in order to provide a transition to community living. There is 24-hour staff supervision, and skills training. Support is provided to help residents achieve the highest level of independence possible.

(f) **SROs (Single Resident Occupancy)** offer more independent living in a studio apartment in a 24 hour 7-day supervised building. Case management, crisis response, medication monitoring; assistance with community living skills and staff supports are available to assist residents to live more independently.

(g) **Young Adults Residence** FEGS operates the first OMH-licensed NY/NYIII residence for Young Adults. The residents range in age from 18-24, many of whom were formerly living in foster care

(h) **Apartment Treatment Programs (ATP)** provide apartment living with support and skills training provided by staff on a daily basis. Residents have their own room in a shared apartment with rehabilitative and supportive services to improve an individual's ability to live as independently as possible with the goal of moving to independent living.

(i) In addition, the Debtor operates programs that provide case management as well as supportive programs including Transitional Employment, Transitional Case Management, ACT Team, and Mobile Crisis programs.

## BASIS FOR RELIEF REQUESTED

**A.**  **Entering into the Omnibus Termination Agreements and
Consummating the Transactions Contemplated
Thereby, Including Entry Into Leases of its Owned
Real Property, is a Valid Exercise of the Debtor's
Sound Business Judgment**

21.    Section 363(b) of the Bankruptcy Code governs the use, sale or lease of assets outside the ordinary course of business.  Section 363(b)(1) provides, in relevant part, that a debtor in possession may, after notice and hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate."  See 11 U.S.C. § 363 (b)(1) and (f).

22.    Under applicable case law, a transaction must represent a reasonable exercise of business judgment on the part of the debtor in possession to be approved under section 363(b) of the Bankruptcy Code.  See, e.g., In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 772 F.2d 1063, 1071 (2d Cir. 1983); In re Adelphia Communications Corp., No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002).  See also In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993), quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy).

23.    As recognized by the Second Circuit in Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d. Cir. 1983), a court may approve a section 363 application after expressly determining from the evidence presented at the hearing that a good business reason exists to grant such application.

14

24.     In addition, Bankruptcy Code section 105(a) grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a). This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case." In re Flores, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003).

25.     The Debtor submits that there are compelling facts and circumstances to support approval of the transfers as described in this Motion, including the entry into leases of its real property for a sufficient period of time to permit the programs to continue operating after the transfer date. While recovery from serious mental illness is achievable, critical to a client's success is establishing trust and engagement with the staff working with them. Continuity of relationship and stability in service delivery leads those with a mental illness to live successfully in the community. The Debtor has thus far been able to maintain much of the existing staff infrastructure of the BH Programs, as many are hoping to transition to JBFCS. Nonetheless, many of the Debtor's professional staff, and especially its psychiatrists, are highly sought after, and have begun to move to other agencies who can promise, if nothing else, stability. If the process is further delayed the resulting uncertainty may prove to be too much to convince those professionals, who in many instances choose to stay solely out of dedication to the Debtor's clients, to remain. While the Debtor has implemented contingency plans to manage the issue, they cannot continue indefinitely. Moreover, this period of transition, the level of media coverage, and the bankruptcy itself have been particularly trying on the Debtor's behavioral health clients. Residential clients have been faced with questions, from landlords and others, regarding their ability to remain in their homes. Outpatient clients have expressed concern as to whether their services will continue with their current MD/therapist. Failure to provide

15

continued services and the lack of certainty as to their delivery come with untenably high costs for the Debtor's clients including relapse, homelessness, hospitalization and incarceration. Accordingly, the Debtor requests authority to enter into the Omnibus Termination Agreements with OMH and JBFCS, enter into leases for its owned real property and execute such other agreements as may be necessary to effectuate such transfers, including such agreements as may be necessary to ensure that client privacy rights are not violated.

**B.    Assumption of the Assigned Contracts and Assignment Procedures Should be Approved**

26.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor".

27.    The business judgment test is the standard applied by courts to determine whether an executory contract or unexpired lease should be assumed. See, e.g., In re Old Carco LL (f/k/a Chrysler LLC), 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); Richmond Leasing Co v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially").   A court should approve assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate. See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr.S.D.N.Y.

16

1989); see also Sharon Steel Corp v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

28.     When assuming an executory contract or unexpired lease, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults. If there has been a default, the debtor must also provide adequate assurance of future performance under the contract or lease. As part of the transfer process the Debtor has committed to curing any defaults under the proposed Assigned Agreements. The Debtor's anticipated cure amounts are set forth on Exhibit C, and the Debtor requests that to the extent there are objections to the proposed cure amounts, and given the Debtor's commitment to paying all cures, that the Court approve the assumption and assignment while holding open the issue of the exact cure amount to a subsequent hearing date. If such relief is granted, the Debtor will work with the objecting party to resolve the cure objection prior to any subsequent hearing. Moreover, JBFCS has the support and funding of OMH, which should suffice as adequate assurance of future performance.

29.     Assuming and assigning the Assigned Agreements to JBFCS is an appropriate exercise of the Debtor's business judgment. The Assigned Agreements consist mostly of residential leases which have been the home for many of FEGS' clients for years, if not decades. As would be expected, this transition period has been trying on FEGS' clients and, even if it were possible, to make those client's leave their homes would be unthinkable. Moreover, these are short term market, or near market, rate leases. Accordingly there can be little to no value realized in connection with any sale or marketing of those leases. The commercial leases are similarly devoid of independent value and the time and expense associated with the relocation of the programs currently operating out of those spaces far outweighs any amounts that might

17

otherwise be able to be realized from a sale thereof. Therefore, assumption of the Assigned Agreements and assignment to JBFCS is clearly an exercise of the Debtor's sound business judgment which warrants approval by this Court.

30.    The Debtor further submits that the notice provided by this Motion and the schedules contained in the Exhibits hereto are reasonably calculated to provide adequate notice to all counterparties to the Assigned Agreements. All of the Assigned Agreements are being assigned to a single party, JBFCS. Accordingly, the Debtor submits that the use of a single motion to approve the assumption and assignment of the Assigned Agreements is appropriate pursuant to Bankruptcy Rule 6006.

## C.    Section 363(d) of the Bankruptcy Code is Satisfied

31.    Pursuant to Section 363(d) of the Bankruptcy Code, the use, sale or lease of property by a not-for-profit entity must be in compliance with applicable nonbankruptcy law. Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation...." 11 U.S.C. § 363 (d).

32.    The Debtor submits that the transfers contemplated by this Motion fully comply with applicable non-bankruptcy law as OMH has consented to the transfer of each of the BH Programs and selected JBFCS as the transferee. The Debtor further submits that no further approvals are required at this time. When the Debtor is prepared to sell its real and personal property assets, the Debtor will request, and expects to obtain, all required regulatory approvals for any such sale, including the approval of the New York State Attorney General. Accordingly,

the proposed transfer of the BH Programs to JBFCS as contemplated by this Motion satisfies the requirements of section 363(d) of the Bankruptcy Code.

## D.    THE COURT SHOULD WAIVE OR REDUCE THE REQUIREMENTS OF RULES 6004

33.    The Debtor's need for immediate authority to enter into the Omnibus Termination Agreement and the Triple Net Leases, and assume and assign the Assigned Agreements is necessary to ensure client health and safety, while complying with its not for profit mission. Accordingly, the Debtor proposes that the 14 day stay period of an order authorizing the use, sale or lease of the Debtor's property as well as the assumption and assignment of executory contracts and unexpired leases imposed by Bankruptcy Rule 6004 should be waived. That rule provides that, unless a court orders otherwise, an order authorizing the assumption and assignment of executory contracts is stayed until the expiration of 14 days after entry of the order. Fed. R. Bankr. P. 6004. The purpose of Bankruptcy Rule 6004 is to provide sufficient time for an objecting party to appeal before the order takes effect. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

34.    As described above, the transfer of the BH Programs to JBFCS is consensual, a sound exercise of the Debtor's business judgment and any delay in authorizing such transfers could severely impact the health and safety of the Debtor's clients. Accordingly, the likelihood of a party in interest objecting to the relief sought herein is negligible, the benefits to the estate and all stakeholders are numerous and the Court should waive the 14 day stay period provided for in Bankruptcy Rule 6004(h), and order that the Debtor is immediately authorized to assume and assign the Assigned Agreements pursuant to Section 365 of the Bankruptcy Code, all as described in this motion.

## NOTICE

35.     Notice of this Motion will be been given to: (a) counsel for the Unsecured Creditors' Committee; (b) the Office of the United States Trustee for the Eastern District of New York; (c) counsel to JBFCS; (d) all counterparties to the Assigned Agreements, including, without limitation, those landlords listed on Exhibit C; (e) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; and (f) all other parties required to be served in accordance with the Case Management Order entered by this Court on April 17, 2015 [Docket No. 160] (collectively, the "**Notice Parties**").  The Debtor submits that no other notice need be given.

36.     No prior request for the relief sought in this Motion has been made to this or any other court in connection with this Chapter 11 Case.

## CONCLUSION

37.     The case law cited herein provides ample authority and justification for the approval of the proposed transactions.  The facts set forth herein also support a finding in favor of an order approving the such transfers.  For these reasons, and the others set forth in this Motion, it is submitted that the transfers should be approved on the terms and provisions set forth in the Omnibus Termination Agreements and the Debtor should be authorized to enter into the Triple Net Leases.

**WHEREFORE** the Debtor respectfully requests that the Court enter an order substantially similar to the proposed order, attached hereto as <u>Exhibit A</u>, granting the relief requested herein, and granting the Debtor such other and further relief as is just and proper.

Dated: April 28, 2015
       Great Neck, New York

                          GARFUNKEL WILD, P.C.

                          By: _____
                          Burton S. Weston
                          Afsheen A. Shah
                          Adam T. Berkowitz
                          111 Great Neck Road
                          Great Neck, NY 11021
                          Telephone: (516) 393-2200
                          Facsimile: (516) 466-5964

                          *Proposed Counsel for the Debtor*
                          *and Debtor-in-Possession*

3197283v.6