**GARFUNKEL WILD, P C**
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Facsimile: (516) 466-5964
Burton S. Weston
Adam T. Berkowitz

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:

FEDERATION EMPLOYMENT AND                      Chapter 11
GUIDANCE SERVICE, INC. d/b/a FEGS[1],          Case No. 15-71074 (REG)

                           Debtor.

-------------------------------------------------------------x

### DEBTOR'S MOTION FOR ENTRY OF ORDER MODIFYING AUTOMATIC STAY, TO THE EXTENT APPLICABLE, TO AUTHORIZE ADVANCEMENT AND PAYMENT OF COSTS AND FEES UNDER DIRECTORS AND OFFICERS INSURANCE POLICIES, AND LIMITING ADVANCEMENTS AND PAYMENTS TO $10,000 PER INSURED PERSON

Federation Employment and Guidance Service, Inc. d/b/a FEGS, ("**FEGS**" or the

"**Debtor**") as debtor and debtor-in-possession in the above-captioned case, hereby moves this

court (the "**Motion**"), pursuant to section 362(d)(l) of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") and Rule 4001-1 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the Eastern District of New

York, for entry of an order substantially in the form attached hereto modifying the automatic stay

of section 362(a) of the Bankruptcy Code (the "**Automatic Stay**"), to the extent applicable, to

permit National Union Fire Insurance Company of Pittsburgh, PA ("**National Union**") and

American International Group, Inc., as claims administrator for National Union, ("**AIG**" and

together with National Union, the "**Carrier**"), to make certain limited payments under and in

---

[1] The last four digits of the Debtor's federal tax identification number are 4000.

accordance with the terms of that certain *Management Liability, Professional Liability, Crime Coverage and Kidnap And Ransom/Extortion Coverage for Not-For-Profit Organizations* insurance policy No. 01-357-64-58 (the "**D&O Policy**") to or for the benefit of the Insured Persons (as defined below) on account of their costs and fees incurred in defending and responding to the Government Investigations (as defined below). In support of this Motion, the Debtor respectfully represents as follows:

## SUMMARY OF RELIEF REQUESTED

1.      As the Court is aware, there are several ongoing investigations (the "**Government Investigations**") seeking to determine, among other things, the underlying cause or causes of the Debtor's financial demise. As part of those investigations, the New York Attorney General's Office, Charities Bureau, the New York County District Attorney's Office, and the United States Attorney's Office, (the "**Investigating Agencies**") are in the process of collecting numerous documents from, and conducting various interviews of current and former officers, directors, and employees of FEGS. To protect against the economic impact of any potential claims and liabilities, the Debtor maintains a D&O Policy in the amount of $15 million. The D&O Policy includes a $250,000 sublimit (the "**Sublimit**"), discussed in further detail below, which is available to pay the expenses incurred by covered individuals (the "**Insured Persons**") in connection with certain investigations, such as the Government Investigations.

2.      To date, the Debtor is aware that a number individuals -- both current and former employees of FEGS -- have been contacted by one or more of the Investigating Agencies to provide information by way of production of documents and/or by giving informal interviews or deposition testimony. Of those individuals, at least five have requested reimbursement for costs incurred in connection with the Government Investigations. Some of those requests are for a few

thousand dollars while others are as high as approximately $50,000. Each of those requests has been forwarded to the Carrier. In separate response letters, the Carrier has, with certain reservations of rights, acknowledged potential coverage of claims by current and former employees, directors, and officers for costs related to the Government Investigations, each of which the Carrier has expressly stated is subject to the Sublimit.

3.     It is in the best interest of this estate, and all of its creditors, that the individuals subject to the Government Investigations be represented by counsel as such representation will facilitate the Government Investigations, focus and streamline the process and potentially reduce the likelihood of a plenary action being commenced. Even if an action is commenced, having competent counsel involved in the investigative stages is likely to reduce the costs and time associated with ultimately defending any such litigation. The payment of thousands of dollars in legal fees by certain of the individuals subpoenaed or asked to be interviewed in these investigations constitutes a significant financial hardship. Yet, given the prepetition nature of any claim for indemnification, the Debtor is unable to reimburse those persons or to pay counsel fees directly. Accordingly, the availability of insurance proceeds to defray the costs being incurred by the individuals offers an equitable solution.

4.     As these investigations are ongoing, the Debtor anticipates that additional claims against the Sublimit will be asserted in the coming weeks and months. In order to avoid depleting the entire Sublimit with claims by those whom the Investigating Agencies have approached earlier in the process, and to provide an equitable distribution of the Sublimit funds, as a condition to releasing any funds at this time, the Debtor seeks to limit payment under the Sublimit to a maximum of $10,000 per claimant (the "**PC Limit**"). This will allow up to at least 25 individuals to share in the Policy Sublimit, thereby establishing a de facto reserve for no less

than an additional 19 potential claimants. To the extent distributions, after application of the PC Limits, total less than $250,000, the Debtor is prepared to revisit the $10,000 per claimant limit and arrange a pro-rata distribution of any remaining funds to Insured Persons that incurred more than $10,000 in reasonable reimbursable costs and expenses.

5.      Moreover, as the Sublimit constitutes less than 2% of the aggregate D&O Policy limit and in light of the benefit to this estate of having the individuals represented by counsel and the concomitant hardship to those same individuals should they be required to bear the costs, the Debtor submits that granting access to the Sublimit on the terms and conditions proposed by the Debtor is in the best interest of the Debtor, its creditors, its current and former officers, directors, and employees as well as this estate. Accordingly, the Debtor respectfully requests the Automatic Stay be modified, to the extent applicable, to permit the Carrier to pay claimants entitled to receive funds under the Sublimit up to the PC Limit.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

7.      The statutory and legal predicates for the relief sought herein is section 362 (d) (1) of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-1.

## BACKGROUND

A.      **The Chapter 11 Case**

8.      On March 18, 2015 (the "**Petition Date**"), the Debtor filed a voluntary petition for reorganization under the provisions of the Bankruptcy Code [Docket No. 1]. Since the

Petition Date, the Debtor has continued in possession and operation of its business and properties as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

9.  No trustee or examiner has been appointed in this Chapter 11 case. On March 31, 2015, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the official committee of unsecured creditors (the "**Committee**") [Docket No. 105], which retained Pachulski Stang Ziehl & Jones, LLP as its counsel and Alvarez & Marsal Healthcare Industry Group, LLC as its financial advisor [respectively, Docket Nos. 332 and 337].

10.  The Debtor filed its Schedules of Assets and Liabilities, and Statements of Financial Affairs (collectively, the "**Schedules**") on April 27, 2015 pursuant to Bankruptcy Code section 521 and Rule 1007 of the Federal Rules of Bankruptcy Procedure [respectively, Docket Nos. 180 and 181].

11.  Early in these proceedings this Court approved the transfers of certain programs being run under the authority of the City of New York. Thereafter, on May 29, 2015, this Court entered two orders approving, among other things, the transfer of all of the Debtor's remaining client related programs. [Docket Nos. 254 and 255]. Pursuant thereto, the Debtor has since transferred all of its client related programs to other financially secure providers thus, ensuring the seamless provision of services, assumed and assigned numerous contracts and leases, and entered into various real estate arrangements, including leases and subleases, to support those transitions.

**B.    The Government Investigations**

12.  As noted above, there are several ongoing Government Investigations seeking to determine the root cause or causes of the Debtor's financial decline. Commencing in or about

5

January 2015, the Investigating Agencies each served subpoenas upon FEGS and certain of its former officers and requested informal production of documents and interviews of other current and former employees, directors, and officers (collectively, the "**Subpoenas**").

13.      To date, the Debtor has produced over one million pages of documents to the various Investigating Agencies, which is exclusive of any documents which may have been produced by the various individuals contacted by the Investigating Agencies.  In addition, the Debtor is aware of numerous informal interviews conducted by the Investigating Agencies as well as formal depositions.

14.      The Debtor has already expended significant resources in response to the Government Investigations.  As of this time, the Carrier is denying coverage to the Debtor directly in connection with the Government Investigations.  The Debtor refutes the Carrier's position and expressly reserves all rights with respect thereto.  The Debtor's direct access to the D&O Policy proceeds in connection with the Government Investigations is not subject to this motion.

15.      This motion seeks to address the Insured Persons who have been, or will be, contacted by one or more of the Investigating Agencies to provide information, deposition testimony and/or informal interviews, and who have expressly requested, or will request, reimbursement for costs incurred in connection with the Government Investigations.  The current requests range from a few thousand dollars to approximately $50,0000, each of which has been forwarded to the Carrier.  As noted above, in separate response letters, the Carrier has, with certain reservations of rights, acknowledged potential coverage of claims by these current and former employees, directors, and officers for costs related to the Government Investigations,

each of which the Carrier has expressly stated is subject to the Sublimit.[2]

## C.    The Insurance Policy

16.    The Debtor's D&O Policy provides $15 million in coverage for any Loss, which is defined in the D&O Policy to include "damages, judgments, settlements, pre- and post-judgment interest, **Defense Costs** . . .," but does not include, "civil or criminal fines or penalties". The D&O Policy is triggered when there is a "**Claim**"[3] which is defined in the Policy, as amended by Endorsement #17, as:

> (1) a written demand for monetary, non-monetary or injunctive relief (including any request to toll or waive any statute of limitations); or
>
> (2) a civil, criminal, regulatory, administrative or mediation proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; or (ii) return of an indictment, information or similar documents (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges; or
>
> (3) solely with respect to **Loss** of any **Individual Insured**, a civil, criminal, administrative or regulatory investigation of an **Individual Insured**, once such **Individual Insured** is identified in writing by such investigating authority as a person against whom a proceeding . . . may be commenced.  It is further understood and agreed that solely in regard to the coverage provided under this subparagraph (3), the maximum limit of [National Union's] liability for all **Loss** of an **Individual Insured** in the aggregate is $250,000 (hereinafter called the "**Individual Investigation Sublimit of Liability**").    This **Individual Investigation Sublimit of Liability** shall be part of and not in addition to any **Separate Limit of Liability** . . . applicable to the D&O Coverage Section . . ." (parenthetical in original).

---

[2] The Debtor reserves all rights, claims, and arguments as to whether or not the Sublimit remains applicable once a formal action is commenced.

[3] As noted above, the Carrier is denying coverage to the Debtor directly in connection with the Government Investigations on the asserted grounds that a "Claim" is not yet ripe under subdivision (1) and (2) of the definition. The Debtor refutes the Carrier's position and asserts that by receipt of the Subpoenas from the Investigating Agencies a Claim is in fact ripe.  As previously noted, however, the Debtor's access to the D&O Policy proceeds in connection with the Government Investigations is not subject to this motion and the Debtor expressly retains and reserves all rights with respect thereto.

17.    The Policy defines "**Individual Insured(s)**" to include "a past, present or future duly elected or appointed director, officer, trustee, trustee emeritus, executive director, department head, committee member (of a duly constituted committee of the Organization), staff or faculty member (salaried or non-salaried), or **Employee** of the **Organization**, or **Outside Entity Executive**."

18.    "**Defense Costs**" is defined as "reasonable and necessary fees, costs and expenses consented to by [National Union] resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**."

19.    As the Debtor receives requests for indemnification and or coverage under the D&O Policy from potentially insured persons such requests are forwarded to the Carrier. In separate response letters, the Carrier has, with certain reservations of rights, acknowledged potential coverage of claims by current and former employees, directors, and officers for costs related to the Government Investigations, each of which the Carrier has expressly stated is subject to the Sublimit.[4]

E.    **The Claims Related to the Government Investigations**

20.    As of the filing of this Motion, at least five Claims have been submitted to the Carrier on behalf of Insured Persons. These claims range in amounts from a few thousand dollars to approximately $50,000. Based on the number of claims filed, and subject to the proposed $10,000 PC Limit, only a small percentage of the Sublimit will be eligible for payment at this time if the relief requested is granted by the Court.

---

[4] As noted above, the Debtor takes no position at this time as to the applicability of the Sublimit once a formal action is commenced and, accordingly, the Debtor reserves all rights, claims, and arguments with respect thereto.

## RELIEF REQUESTED

21.     Prior to the commencement of this Chapter 11 case, the Debtor purchased the

D&O Policy to provide coverage for FEGS and its current and former directors, officers, and

employees.  Coverage is provided by the Carrier under the D&O Policy for, among other things,

the defense of the Government Investigations.  The Carrier has acknowledged that there is

coverage for the Insured Persons in connection with the defense of the Government

Investigations under the D&O Policy, subject to the Sublimit.  However, given the pendency of

the Chapter 11 Case, the Carrier has indicated that before it reimburses Insured Persons in

connection with Government Investigations, or advances any other defense costs, it requires an

order of the Court confirming that the release of policy proceeds will not violate the Automatic

Stay.

22.     After reviewing the D&O Policy and examining the totality of the circumstances

surrounding the Government Investigations, the Debtor makes the instant Motion seeking entry

of an order modifying the Automatic Stay, to the extent applicable, to permit the Carrier to make

payments, subject to both the Sublimit and the PC Limits proposed herein, under and in

accordance with the terms of the D&O Policy, to or for the benefit of the Insured Persons for the

reimbursement and payment of such persons' costs associated with the defense of the

Government Investigations.  Such relief is in the best interests of the Debtor's estate, its current

and former officers, directors and employees, as well as its creditors and other constituents.

23.     As noted above, the Debtor is only seeking authority to release payments up to the

Sublimit (which is all the Carrier has confirmed is currently available).  Moreover, in order to

avoid depleting the entire Sublimit with claims by those whom the Investigating Agencies have

approached earlier in the process, and to provide an equitable distribution of the Sublimit funds,

9

as a condition to releasing any funds at this time, the Debtor proposes the PC Limit of $10,000 per claimant. Balancing the equities requires that the additional PC Limit be imposed at this juncture. Based on the number of claims received to date, the Debtor asserts that the PC Limit provides a meaningful payment to individuals who have already incurred costs while also allowing up to at least 25 individuals to share in the proceeds of the D&O Policy Sublimit. This ensures that in addition to the current claims, a de facto reserve for no less than an additional 20 potential claimants is established. To the extent aggregate claims, after giving effect to the PC Limit, are less than the $250,000, the Debtor is prepared to revisit the $10,000 per claimant limit and arrange a pro-rata distribution of any remaining funds on account of reasonable costs incurred in connection with the investigations.

24.    As the relief sought herein is limited to the payment of the Covered Persons pursuant and subject to the Sublimit, the Debtor reserves all rights, claims, defenses and arguments with respect to the remainder of the D&O Policy.

**BASIS FOR RELIEF**

25.    Section 362(d)(1) of the Bankruptcy Code allows the Court to modify the automatic stay "for cause." 11 U.S.C. § 362(d)(1). "Cause" is not defined in the Bankruptcy Code and it " is a broad and flexible concept that must be determined on a case-by-case basis." In re MF Global Holdings Ltd., 469 B.R. 177, 191 (Bankr. S.D.N.Y. 2012). The Debtor submits that cause exists to modify the Automatic Stay, to the extent applicable in the instant matter.

26.    Given the scope and nature of the Government Investigations it is inadvisable for any person to comply with the Investigating Agencies requests for documents, information and/or interviews without the ability to consult with, and be represented by, competent counsel.

10

For many of the Debtor's current and former employees especially, the costs associated with obtaining such representation is simply too much for them to bear. Accordingly, immediate availability of up to $250,000 in insurance proceeds to defray such costs will greatly reduce, if not eradicate, the incredible burden being placed on the Debtor's current and former employees. Moreover, when viewed in light of the minimal impact that the release of $250,000 of D&O Policy proceeds might have on the overall estate, the equities weigh strongly in favor or the release of such funds.

27.    There are also direct and tangible benefits to the estate in having these individuals represented by competent counsel. By having counsel participate in the investigatory stages of this matter, thereby ensuring thorough, timely, and responsive feedback to the Investigating Agencies' inquiries, it will certainly focus and streamline the investigation process and might well lead Investigating Agencies to conclude that no further action need be taken, and that no plenary action be commenced. Even if an action is ultimately commenced, by having counsel involved from the outset, future litigation costs will be greatly reduced and the interests of judicial economy will be served as there will be little to no "learning curve" associated with bringing counsel "up to speed" in connection with what could turn out to be an incredibly complex litigation.

28.    The Debtor also notes that the instant request seeks authority only for distributions up to the Sublimit, which constitutes less than 2% of the aggregate D&O Policy limit. Moreover, the proposed PC Limit further protects future claimants who may need to access the Sublimit under the D&O Policy. Accordingly, the Debtor submits that there can be little to no prejudice to any party by potentially reducing the $15 million limit under the D&O Policy by a mere $250,000. Courts in this Circuit and other jurisdictions have permitted the

11

advancement of defense costs to a debtor's current and former directors, officers and employees, even where such advances may ultimately reduce the total funds available directly to cover the debtor.  See, e.g., In re MF Global Holdings Ltd., 469 B.R.at 192; see also In re Downey Fin. Corp., 428 B.R. 595 (granting relief from stay for cause in order to permit use of D & O policy proceeds for payment of defense costs); In re Enron Corp., No. 01–16034, 2002 WL 1008240 (Bankr. S.D.N.Y. May 17, 2002) (granting relief from stay, to the extent applicable, for payment of defense costs); In re CyberMedica, Inc., 280 B.R. 12, 18-19 (Bankr. D. Mass. 2002) (granting relief from stay for cause because directors and officers would suffer irreparable harm if prevented from exercising their rights to defense payments under D&O policy).

## NOTICE

29.    Notice of this Motion will be given to: (i) the U.S. Trustee; (ii) Counsel to the Committee; (iii) each of the Investigating Agencies; (iv) the Carrier, or its counsel; (v) those individuals known to have already asserted a claim against the D&O Policy, or their counsel; and (vi) all parties entitled to notice pursuant to the Case Management Order entered by the Court on April 17, 2105 [Docket No. 160]. The Debtor submits that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

30.    No prior request for the relief sought in this Motion has been made to this or any other Court.

**WHEREFORE**, for the reasons set forth herein, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: Great Neck, New York
October 2, 2015

<div style="margin-left: 40%">

**GARFUNKEL WILD, P.C.**

By: _____

Burton S. Weston, Esq.
Adam T Berkowitz, Esq.
111 Great Neck Road
Great Neck, New York 11021
Tel: (516) 393-2200
Fax: (516) 466-5964
*Counsel for the Debtor and Debtor-In-Possession*

</div>