UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>FEDERATION EMPLOYMENT AND GUIDANCE SERVICE, INC. d/b/a FEGS,<br><br>                      Debtor. | Chapter 11<br><br>Case No. 15-71074 (REG) |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF FEGS,<br><br>                      Plaintiff,<br><br>vs.<br><br>LOEB & TROPER LLP,<br><br>                      Defendant. | Adv. Proc. No. 17-_____ |

## COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors of Federation Employment and Guidance Service, Inc. d/b/a FEGS ("FEGS" or the "Debtor"), the debtor and debtor in possession in the above-captioned case pending under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), by and through its undersigned counsel, as and for its *Complaint* (the "Complaint") against Loeb & Troper LLP (the "Defendant" or "Loeb & Troper"), alleges as follows:

### Jurisdiction and Venue

1. On March 18, 2015 (the "Petition Date"), FEGS filed a petition with the Court under chapter 11 of the Bankruptcy Code. FEGS is operating its business and managing its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the chapter 11 case.

2.  This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.  This adversary proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure and is a core proceeding under 28 U.S.C. §157(b).  Venue herein is proper pursuant to 28 U.S.C. §§ 1409(a) and 1409(c).

3.  Plaintiff alleges each allegation herein upon information and belief, except as to allegations pertaining to the Plaintiff.

### Nature of the Action

4.  This action is brought by Plaintiff against the Defendant, an accounting firm that provided auditing services to the Debtor, for Defendant's negligence.

### The Parties

5.  The Plaintiff is the Official Committee of Unsecured Creditors appointed in FEGS's chapter 11 case by the United States Trustee on or about March 31, 2015.  The United States Trustee appointed the Committee to represent FEGS's unsecured creditors pursuant to 11 U.S.C. § 1102(a)(1). On February 23, 2017, the Court entered its *Stipulation and Order Authorizing Official Committee of Unsecured Creditors to Prosecute Certain Claims on Behalf of the Estate* [Docket No. 813]  (the "Standing Stipulation").  The Plaintiff has standing to commence this action pursuant to the Standing Stipulation and, in accordance therewith, brings this Complaint on behalf of the Debtor's estate.

6.  Upon information and belief, Defendant Loeb & Troper is an entity organized and existing under the laws of the state of New York, with its principal place of business at 655 Third Avenue, New York, New York 10017.

### The Debtor's Business

7. Founded in 1934, FEGS was a New York not-for-profit corporation. Prior to its bankruptcy filing, FEGS provided health and social services to approximately 120,000 people annually in the area of behavioral health, disabilities, housing, homecare, employment/workforce, education and youth and family services. Some of the major programs operated by FEGS were the Wellness, Comprehensive Assessment, Rehabilitation and Employment Program ("WeCARE"), Back to Work, education and youth services for at-risk youth and Connect to Care. FEGS also administered residential and support programs for the developmentally disabled and behavioral treatment and residential programs for the mentally ill. At its recent peak, FEGS operated over 350 locations throughout metropolitan New York and Long island and had over two thousand employees.

8. FEGS derived its operating revenue from three primary sources: (1) contracts with various government agencies, (2) state and federal Medicaid dollars and (3) private donations and grants.

### The WeCare Contracts

9. Prepetition, the Debtor contracted with the New York City Human Resources Administration to provide services for HRA's Wellness, Comprehensive Assessment, Rehabilitation and Employment ("WeCARE") program. WeCARE contractors (of which FEGS was one) provide a continuum of services to help individuals with medical and/or mental health disabilities. Individuals referred to WeCARE receive a comprehensive bio psychosocial assessment to identify clinical conditions and social barriers that may affect their ability to participate in work-related activities. Based on the results of this assessment, WeCARE contractors determine an individual's functional capacity, develop a customized service plan, and

provide a full range of services designed to help stabilize the client's health conditions and obtain self-sufficiency and employment.

10. FEGS performed WeCARE services pursuant to a series of contracts (collectively, the "WeCare Contracts"). Pursuant to the WeCare Contracts, FEGS was to be paid after achieving various milestones for services provided to each client, including milestones that were to be completed within a specific time period in order to be compensable.

11. However, in numerous instances, FEGS (a) failed to achieve numerous milestones within the required time period, (b) failed to properly seek payment within the specified time period for numerous milestones it did achieve and (c) failed to properly document numerous milestones it achieved. As such, HRA denied many of FEGS's requests for payment on account of such failed milestones. Rather than accept that such requests for payment were not compensable, FEGS carried such denied payments as an account receivable on its books and records without making any allowance for bad debt (any such receivables, the "Doubtful WeCare Receivables"). FEGS did not properly account for the Doubtful WeCare Receivables as doubtful of collection or as bad debt.

12. As a result of FEGS's failure to properly account for the Doubtful WeCare Receivables, FEGS overstated its accounts receivables for its fiscal years ending June 30, 2011 through June 30, 2013. In addition, as a result of this overstatement, FEGS also incurred losses that were not reflected on its financial statements during the fiscal years ending June 30, 2011 through June 30, 2013. FEGS waited until preparing its financial statement for the fiscal year ending June 30, 2014 to address the receivables it had overstated for years. The resulting loss in 2014 was a cumulative loss reported all at once. This cumulative loss led the Debtor into liquidation under chapter 11. If the losses had been recognized as they were occurring, FEGS

could have addressed the problem in a manner that would have avoided a liquidation under chapter 11.

### Loeb & Troper Audited the Debtor's Financial Statements

13. Loeb & Troper audited FEGS's financial statements for many years prepetition, including for the fiscal years ending June 30, 2011 through June 30, 2013. During those years, the management letters issued by Loeb & Troper did not address or raise any concerns about FEGS's overstated accrual of accounts receivables.

### FEGS's Financial Statements Overstated Accounts Receivable

14. During the audit of FEGS's financial statements for the fiscal year ending June 30, 3014, FEGS determined that it needed to allow approximately $13.7 million for accounts receivable that were likely uncollectible. This amount included Doubtful WeCare Receivables that had been improperly carried on FEGS's financial statements as accounts receivable for many years.

15. During the fiscal year ending June 30, 2010, FEGS made an allowance of approximately $5,892,600 for doubtful accounts receivable.

16. During the fiscal year ending June 30, 2011, FEGS made an allowance of approximately $5,955,500 for doubtful accounts receivable.

17. During the fiscal year ending June 30, 2012, FEGS made an allowance of approximately $5,942,093 for doubtful accounts receivable.

18. During the fiscal year ending June 30, 2013, FEGS made an allowance of approximately $6,700,000 for doubtful accounts receivable.

19. The allowance for doubtful accounts receivable more than doubled for the fiscal year ending June 30, 2014, to $13.7 million, on account of overstated accounts receivable

that included the Doubtful WeCare Receivables.  These doubtful receivables had never been properly reflected on FEGS's financial statements.

### FEGS's Financial Statements Understated Bad Debts

20. Similarly, FEGS's accounting for bad debt increased dramatically during the fiscal year ending June 30, 2014.

21. FEGS reported bad debt of approximately $1,001,821 for the fiscal year ending June 30, 2010.

22. FEGS reported bad debt of approximately $851,611 for the fiscal year ending June 30, 2011.

23. FEGS reported bad debt of approximately $1,026,173 for the fiscal year ending June 30, 2012.

24. FEGS reported bad debt of approximately $1,436,238 for the fiscal year ending June 30, 2013.

25. FEGS's reported bad debt increased more than fivefold, to $7,757,170, for the fiscal year ending June 30, 2014.  This massive increase is due to the overstated WeCare receivables that FEGS had been improperly reporting as accounts receivable without making any allowance for the doubtful collection of such receivables.  FEGS's management only acknowledged that it had a problem with its accrued Doubtful WeCare Receivables after the fiscal year ending June 30, 2014.  After management indicated that it would need to acknowledge a portion of the Doubtful WeCare Receivables as bad debt, Loeb & Troper began to review the issue.  As a result of Loeb & Troper's and the Debtor's review of the bad debt, the Debtor reported its dramatic increase in bad debt and (as described below) a massive loss in excess of $18.3 million.

26. FEGS's bad debt was reflected as an expense on its Consolidated Statement of Expenses. As such, any restatement of FEGS's bad debt had a direct impact on FEGS's reported net cash flow.

### FEGS Was Damaged by the Misstatements in Its Financial Statements

27. The impact of the overstatement of FEGS's financial statements during the fiscal years ending 2011 through 2013 was significant. FEGS's revenues were historically reported to be little more than its expenses (given FEGS's size). As such, a restatement of its accounts receivables during prior years had a dramatic impact on FEGS's past financial performance.

28. During the fiscal year ending June 30, 2010, FEGS reported that its revenues exceeded its expenses by approximately $1,569,155. During this period FEGS reported revenues of approximately $241,979,776 and expenses of approximately $240,410,621.

29. During the fiscal year ending June 30, 2011, FEGS reported that its revenues exceeded its expenses by approximately $2,700,765. During this period FEGS reported revenues of approximately $239,143,283 and expenses of approximately $240,410,621.

30. During the fiscal year ending June 30, 2012, FEGS reported that its revenues exceeded its expenses by approximately $124,998. During this period FEGS reported revenues of approximately $232,401,563 and expenses of approximately $232,276,565.

31. During the fiscal year ending June 30, 2013, FEGS reported that its revenues exceeded its expenses by approximately $1,531,761. During this period FEGS reported revenues of approximately $253,215,718 and expenses of approximately $251,683,957.

32. In contrast, for the fiscal year ending June 30, 2014, FEGS reported that its expenses were more than $21 million higher than its revenues. During this period FEGS reported revenues of approximately $263.5 million and expenses of approximately $284.9

million. The continued overstatements of FEGS's accounts receivable contributed to this dramatic loss because the cumulative effects of the misstated financial statements were reflected in FEGS's 2014 financial statements.

## Loeb & Troper Failed to Detect and
## Report the Overstatements in FEGS's Financial Statements

33. Loeb & Troper issued management letters for its audits of FEGS's financial statements for the three fiscal years ending June 30, 2011 through June 30, 2013. Each of these three management letters stated that Loeb & Troper did not identify any material weaknesses in FEGS's internal controls; nor did the letters disclose any concerns regarding FEGS's continued accrual of WeCare Receivables that should have been either classified as doubtful receivables or subject to a reserve for doubtful receivables.

34. Notably, Loeb & Troper did issue a management letter for the fiscal year ending June 30, 2014, which described four issues with FEGS's accounts receivable. Specifically, Loeb & Troper noted that

    a.    During the year, the follow up process for denied claims was not monitored. As a result of this lapse in the system, there was a significant increase in the denied claims that were not rebilled timely and therefore rendered uncollectible. A process should be developed that ensures prompt follow up, review, and rebilling of denied claims.

    b.    The accounts receivable subsidiary was not routinely reconciled to the general ledger control account. The reconciliation would serve as a check on the accuracy of the record keeping process and ensure that the details reconcile to the general ledger control account.

    c.    Management was unable to generate an automated report from the system that provides a complete schedule of subsequent cash receipts as they relate to June 30, 2014 balances. This was a result of a delay in posting cash receipts to specific vendors. The cash

                receipts are posted to the programs, but not immediately associated with specific invoices. This generates cash receipts in the system that cannot be readily associated with dates of service in the accounts receivable subledger. Management should review its process of posting cash receipts to specific vendors.

      d.      Management's calculation of its allowance for doubtful accounts is driven by formulas that were developed a number of years ago. These calculations may be skewed by specific write-offs in certain years. Management should reevaluate its process in determining its calculation for the allowance of doubtful accounts. The review of the accounts receivable should be reviewed monthly to evaluate it the reserve is sufficient. This would avoid large year end adjustments.

      35.      Each of the issues identified in the 2014 management letter could and should have been identified in prior management letters relating to the 2011, 2012, and 2013 financial statements. Loeb & Troper's failure to identify these issues in prior years caused FEGS to continue to overstate its assets until such time that it had to take the massive $13.7 million writeoff in 2014. Loeb & Troper simply looked away while FEGS's financial statements swept problems under the rug. This turned what could have been a minor, but repairable problem, into an insurmountable cumulative loss reported in 2014 from which FEGS could not recover.

### FEGS Incurred Damages Due to Loeb & Troper's Negligence

      36.      The $18.3 million loss reported in 2014 was a body-blow to FEGS and ultimately caused FEGS to commence its chapter 11 case. This result could have been avoided if FEGS's financial statements accurately reflected its true financial condition. Rather than report doubtful and uncollectible accounts receivable as they were accrued, FEGS had to report such receivables all at once. The shocking disclosure of FEGS's massive loss caused FEGS to be unable to restructure itself, which in turn, led to its liquidation in chapter 11.

## First Claim for Relief
**(Negligence)**

37. The Plaintiff repeats and realleges the allegations contained in each preceding paragraph of this Complaint as though set forth fully herein.

38. Defendant owed a duty to the Debtor to exercise reasonable care and skill in the performance of its audits of the Debtor's financial statements.  Loeb & Troper's services to FEGS fell below a reasonable standard of care

39. By virtue of the conduct, acts and omissions described above, the Defendant negligently breached its duties to the Debtor by failing to exercise due care in the performance of its accounting and auditing services for the Debtor.

40. Based on the Defendant's negligence, the Debtor incurred debt and continued inappropriate business activities in reliance on the overstated financial statements.

41. As a result of the Defendant's negligence, the Debtor's financial statements were misstated and, thus, the Debtor continued to operate and incurred excessive debt and other payment obligations.. The disclosure of the massive overstatement of FEGS's accounts receivable in the 2014 financial statements caused FEGS to be unable to continue as a going concern due, among other things, to loss of government contracts and licenses, as well as FEGS's inability to pay its debts as they came due.  The cumulative amount of the disclosure, which was only realized in the fiscal year 2014 financial statement, resulted in more harm to FEGS than if the financial statements had accurately reflected FEGS's financial condition at the time that FEGS's receivables were first overstated and its bad debt first understated.  The continued failure of the Defendant to accurately audit FEGS's financial statements exacerbated

FEGS's financial problems when the cumulative disclosure was suddenly reported in 2014. The full scope of FEGS's damages is not possible to calculate at this time, but in no event is less than the losses incurred by holders of allowed claims against FEGS and the costs of administering FEGS's chapter 11 case.

WHEREFORE, the Plaintiff prays for judgment as follows:

1. On the First Claim for Relief, judgment in favor of the Plaintiff and against the Defendant in an amount to be determined at trial;

2. For the costs of suit incurred herein to the extent permitted by law;

3. For prejudgment interest on any award, attorneys' fees, and costs incurred by the Debtor and/or the Plaintiff to the extent allowed by any applicable law, contract, or statute; and

4. Such other and further relief as the Court may deem just and proper under the circumstances.

Dated:  March 20, 2017                              PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Ilan D. Scharf*
Ilan D. Scharf
Beth E. Levine
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700
Facsimile:   (212) 561-7777
Email:  ischarf@pszjlaw.com
          blevine@pszjlaw.com

Attorneys for Plaintiff, the Official Committee of Unsecured Creditors of FEGS